1    THEODORE E. BACON (CA Bar No. 115395)
     tbacon@AlvaradoSmith.com
2    DAVID L. CHAVEZ (CA Bar No. 117593)
     dchavez@AlvaradoSmith.com
3    ALVARADOSMITH
     A Professional Corporation
4    235 Pine Street, Suite 1200
     San Francisco, CA 94104
5    Tel:  (415) 624-8665
     Fax: (415) 391-1751
6

7    Attorneys for Defendant
     JPMorgan Chase Bank, N.A.

8

9           **UNITED STATES DISTRICT COURT**

10     **NORTHERN DISTRICT OF CALIFORNIA – OAKLAND COURTHOUSE**

11

| | |
|---|---|
| 12   TERESA ROWLAND, BRIAN ROWLAND, | **CASE NO.:** |
| 13        Plaintiffs, | |
| 14   v. | **NOTICE OF REMOVAL** |
| 15   JPMORGAN CHASE BANK, N.A.; SELECT | |
| 16   PORTFOLIO SERVICING, INC. AND U.S. BANK, N.A., SUCCESSOR TRUSTEE TO | **ACTION FILED:**    December 5, 2013 |
|   BANK OF AMERICA, N.A., SUCCESSOR IN | |
| 17   INTEREST TO LASALLE BANK, N.A. AS TRUSTEE ON BEHALF OF THE HOLDERS | |
| 18   OF THE WASHINGTON MUTUAL MORTGAGE PASS-THROUGH | |
| 19   CERTIFICATES, WMALT Series 2006-AR9, and DOES 1 through 100, inclusive, | |
| 20 | |
|        Defendants. | |
| 21 | |

22

23

24

25

26

27

28

ALVARADOSMITH
A PROFESSIONAL CORPORATION
SAN FRANCISCO

NOTICE OF REMOVAL
3764946.1 -- AL109.F95

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE THAT** Defendant JPMorgan Chase Bank, N.A., ("JPMorgan"), respectfully files this Notice of Removal, pursuant to 28 U.S.C. §§ 1441 *et seq.* to remove the above captioned matter from the Superior Court of the State of California for the County of Alameda, in which the case is now pending, to the United States District Court for the Northern District of California.  In support thereof, Defendants state as follows:

1.      On or about December 5, 2013, plaintiffs Teresa Rowland and Brian Rowland ("Plaintiffs") filed a Complaint in the Superior Court of the State of California for the County of Alameda, Case Number RG13705690 ("State Action"). (Attached hereto as Exhibit "A").  Plaintiffs' Complaint includes eight causes of action including:  (1) Breach of Contract (Modification Agreement); (2) Promissory Estoppel; (3) Real Estate Settlement and Procedures Act (RESPA), 12 U.S.C. §§2601, *et. seq.*; (4) Negligence; (5) Intrusion Upon Seclusion; (6) Violation of California Consumer Credit Reporting Act, Civ. Code §1785.1 *et seq.*(7) Violation of the Rosenthal Fair Debt Collection Practices Act Civ. Code §1788, *et. seq.*, and (8) Violation of California Business and Professions Code §17200, et. seq.  Plaintiffs' third cause of action is premised on alleged violations of federal law.  These allegations present Federal Questions.

2.      Defendant was served with a complaint via process server on December 13, 2013. Therefore, this Notice of Removal is timely pursuant to 28 USC § 1446 because it is filed within thirty days of Defendant's initial receipt of the Complaint.  A copy of the Complaint is attached hereto as Exhibit "A" as required by 28 U.S.C. § 1446(a).

3.      This action is a civil action on which this Court has original jurisdiction under 28 USC § 1331, and is one which Defendant may remove to this Court pursuant to 28 USC § 1441(b). The action arises from the laws of the United States, because in the Complaint, Plaintiff alleges violations of 12 U.S.C. §2601.    *See* Complaint, ¶¶ 60-68.

4.      Consents to this Notice have not been yet obtained because the remaining defendants have not yet been served, have been improperly served or have not yet filed a response to the complaint.

///

ALVARADOSMITH
A PROFESSIONAL CORPORATION
SAN FRANCISCO

5.     Defendant will give written notice of the filing of this Notice of Removal to counsel for Plaintiffs, and will file a copy of this Notice of Removal with the Superior Court of the State of California for the County of Santa Clara, as required by 28 U.S.C. § 1446(d).

6.     Payment of the appropriate fees and costs for removal and docketing of this matter in federal court, if any, are tendered with this Notice.

WHEREFORE, Defendant respectfully requests that this action proceed in this Court as an action properly removed hereto.

DATED:  January 2, 2014

ALVARADOSMITH
A Professional Corporation

By: _____
THEODORE E. BACON
DAVID L. CHAVEZ
Attorneys for  Defendant
JPMorgan Chase Bank, N.A.

# EXHIBIT A

Maeve Elise Brown. State Bar No. 137512
Elizabeth S. Letcher. State Bar No. 172986
Cynthia Singerman. State Bar No. 244450
HOUSING AND ECONOMIC RIGHTS ADVOCATES
1814 Franklin Street. Suite 1040
Oakland, CA 94612
Telephone:    (510) 271-8443
Email: eletcher@heraca.org

William E. Kennedy State Bar No. 158214
CONSUMER LAW OFFICE OF WILLIAM E. KENNEDY
2797 Park Avenue, Suite 201
Santa Clara, California 95050
Telephone: (408) 241-1000
Email: wkennedy@kennedyconsumerlaw.com

Attorneys for Plaintiffs
TERESA AND BRIAN ROWLAND

ENDORSED
FILED
ALAMEDA COUNTY

DEC 0 5 2013

CLERK OF THE SUPERIOR COURT
By _____

SUPERIOR COURT OF CALIFORNIA. COUNTY OF ALAMEDA

UNLIMITED JURISDICTION

RG13705690

| | |
|---|---|
| TERESA ROWLAND, BRIAN ROWLAND. | Case No. |
| Plaintiffs, | |
| v. | COMPLAINT |
| JPMORGAN CHASE BANK, N.A., SELECT PORTFOLIO SERVICING, INC., AND U.S. BANK, N.A., SUCCESSOR TRUSTEE TO BANK OF AMERICA, N.A., SUCCESSOR IN INTEREST TO LASALLE BANK, N.A. AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE WASHINGTON MUTUAL MORTGAGE PASS-THROUGH CERTIFICATES, WMALT Series 2006-AR9, and DOES 1 through 100 inclusive, | 1. Breach of Contract (Modification Agreement) 2. Promissory Estoppel 3. Real Estate Settlement and Procedures Act (RESPA), 12 U.S.C. §§ 2601, et seq.; 4. Negligence 5. Intrusion Upon Seclusion 6. Violation of California Consumer Credit Reporting Act, Civ. Code § 1785.1 et seq. 7. Violation of the Rosenthal Fair Debt Collection Practices Act, Civ. Code § 1788, et seq. 8. Violation of Bus. & Prof. Code § 17200, et seq. |
| Defendants. | DEMAND FOR JURY TRIAL. |

COMPLAINT

1

**INTRODUCTION**

1.     Defendant JPMorgan Chase entered into a permanent loan modification agreement with Plaintiffs Teresa and Brian Rowland in 2011.  Although the Rowlands have made every single payment due since then, Chase has reneged on the modification agreement, continued to treat them as though they were in default, and offered them two less favorable and improper modification agreements.  Finally, in July 2013, Chase offered an acceptable modification agreement.  Even though the Rowlands signed that agreement, and have timely continued to make every single payment on time *since the first modification agreement in 2011*, they still do not have a permanent modification in place.  At the last moment, Chase transferred servicing of their loan to defendant Select Portfolio Servicing, and they continue to be treated as in default.

2.     The Rowlands have been severely damaged as a result.  They have suffered years of harassment by Chase, as Chase telephoned the Plaintiffs well more than fifty (50) times after being requested to cease, and made unnecessary field visits to the family home.  Chase also reported inaccurate derogatory information on the Plaintiff's consumer credit reports.

3.     Teresa and Brian Rowland bring this action to get the mortgage modification they entered into two years ago, and for damages relating to Defendants' unlawful, abusive, and shockingly shoddy handling of their home mortgage loan.

**PARTIES**

4.     Plaintiff Teresa Rowland is an individual and at all relevant times herein was a resident of Alameda County, California.

5.     Plaintiff Brian Rowland is an individual and at all relevant times herein was a resident of Alameda County, California.

6.     Defendant JPMorgan Chase Bank, N.A. (hereinafter "Chase") the servicer of the mortgage encumbering the Rowland family's home from 2011 to August 1, 2013, is a national banking association organized under the laws of the United States and not incorporated in any state.  Chase was at all relevant times and is qualified to do business in the state of California and transacted business in Alameda County.

COMPLAINT

7.      Defendant Select Portfolio Servicing, Inc. (hereinafter "SPS"), the servicer of the mortgage encumbering the Rowland family's home after August 1, 2013, is a Utah corporation, with its principal place of business located in Salt Lake City, Utah.  SPS was at all relevant times and is qualified to do business in the state of California and transacted business in Alameda County.

8.      Defendant U.S. Bank, N.A., successor Trustee to Bank Of America, N.A., successor in interest to LaSalle Bank, N.A. as Trustee, on behalf of the holders of the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 (the securitized trust which purports to own the mortgage and note related to the property at issue in this action), is a national banking association organized under the laws of the United States and not incorporated under the laws of any state.  U.S. Bank states on its website that its headquarters are in Minneapolis, MN 55402.

9.      Plaintiffs are ignorant of the names and capacity of Defendants herein sued as DOES 1-100 inclusive, and therefore sue these Defendants by such fictitious names.  When the true names and capacities of these Defendants become known, Plaintiffs will amend this Complaint to include their true names and capacities and, if necessary, will seek leave to amend to add additional allegations against them.  Plaintiffs are informed and believe, and so allege, that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in the Complaint, and that Plaintiffs' damages were proximately caused by their conduct.

10.      At all times mentioned herein, each defendant acted as an authorized agent, employee or other representative of each other defendant. Each act of each defendant complained of herein was committed within the scope of said agency, employment or other representation, and/or each act was ratified by each other defendant. Each defendant is liable, in whole or in part, for the damages and injuries Plaintiffs suffered.

### VENUE AND JURISDICTION

11.      The Defendants, and each of them, are subject to the jurisdiction of Alameda County Superior Court of the State of California by virtue of their business dealings and transactions in California, and by causing injurious effects in California by their acts or

COMPLAINT

1  omissions.

2      12.    Venue is proper in this Court because the property and transactions at issue

3  occurred in Alameda County.

4                              **FACTUAL BACKGROUND**

5      13.    Plaintiffs Brian and Teresa Rowland are both on title to their home at 459

6  Washburn Drive in Fremont, California.

7      14.    The Rowlands purchased their home in 2006 for $810,000, using a $648,000

8  negatively amortizing mortgage loan to Teresa Rowland, and paying the remainder in cash. The

9  loan provided for a 40-year term, and an interest rate of 7.75% that would change monthly

10  according to an index, but locked the Plaintiffs into a "teaser" rate of only 1% for the first year,

11  adding the additional 6.75% interest to the unpaid balance. After the first year the loan provided

12  several payment options including negatively amortizing options, which would disappear only

13  when the loan balance had risen to $712,800. A true and correct copy of the Loan Note and

14  associated Deed of Trust, and riders are attached hereto as Exhibits A .

15      15.    The Rowlands first contacted their mortgage servicer, then Washington Mutual,

16  in 2008 after Teresa's income from her process-servicing business dropped. Brian's employer

17  was unable to honor a promised salary increase, and the payments on their negatively amortizing

18  mortgage increased.  They applied for a modification in 2009.   They finally entered into a trial

19  modification under the federal Home Affordable Modification Program ("HAMP") with Chase

20  in April, 2011. They timely made the requested three trial period payments.

21      16.    In October, 2011, the Rowlands received a Home Affordable Modification

22  Agreement. The loan modification was to be effective as of December 1, 2011.  The modified

23  loan would have a total principal balance of $819,645.76, of which $151,245.76 would not bear

24  interest.  In addition, $120,445.76 of the deferred principal would be eligible for forgiveness

25  over the course of three years.  The total interest bearing principal would be $668,400.00.   The

26  interest rate for the first five years was 2%, with a principal and interest payment of $2,024.09

27  and an estimated payment, including escrow, of $2,813.17. The interest rate would gradually

28  step up to 4% in 2017.  Because the loan was amortized over 40 years, but would have a term of

4

only 34 years, it had a balloon payment of $181,648.14.   A true and correct copy of the December 2011 HAMP modification agreement is attached hereto as Exhibit B.

17.     Teresa Rowland signed and returned the first HAMP Modification, and timely made the first payment of $2,813.17 for December, 2011 and the second payment for January, 2012.

18.     Nonetheless, in January, 2012, Chase sent Ms. Rowland a second HAMP loan modification agreement to sign.   Ms. Rowland called the Chase representative assigned to her loan, Lindsey Bull, who stated that there was a very small error in the first set of documents. She indicated that the modification was complete, and that Ms. Rowland should continue making payments.

19.     In fact, the new agreement was less favorable.   It added about $4,000 to the non-interest bearing loan balance, making the new principal balance $823,727.32.   The interest bearing principal amount was the same.   The monthly payment amounts were the same for the first seven years, but starting in 2018, the loan would become fixed at 4.75% rather than 4% - a difference of about $200 per month for 26 years.

20.     The Rowlands were so exhausted by the two years of trying to get a modification and pleased to have it behind them that Ms. Rowland signed and returned the new agreement, despite the less favorable terms.

21.     The Rowland family has continued to make timely payments of $2817.13 since December, 2011.  They have never missed a monthly payment.

22.     Chase representative Lyndsey Bull told Teresa Rowland it could take up to three or four months to finalize the modification, and that the Rowlands would receive a completed, recorded copy when it was finalized.

23.     In March, 2012, however, the Rowlands received a mortgage statement which requested a higher payment.  Teresa Rowland also received a collection call from a "Peter" at Chase, who asked her why she was not making her loan payments, and seemed to know nothing about the modification.  When Teresa Rowland spoke the same day to Ms. Bull, Ms. Bull told her to disregard the statement, and that the modification was in place and it was in the process of

COMPLAINT

1    being finalized.

2        24.    By the summer of 2012, the Rowlands started getting repeated collection calls

3    from Chase, stating that they were behind on their mortgage. Ms. Rowland would try to explain

4    that they had entered into a permanent loan modification, but the collection representatives

5    would say that they did not see a modification and were in a different department. There were

6    many collection calls that the Rowlands did not pick up because they recognized the incoming

7    number and their many attempts to explain the existence of the modification to Chase personnel

8    had been futile. The collection calls were extremely distressing and confusing to the Rowlands.

9        25.    Throughout the summer of 2012, Teresa Rowland called to check on the status of

10    the modification. Each time, Chase representatives assured her that the loan modification was

11    being finalized.

12        26.    But despite all these assurances, Chase continued to treat the loan as though it

13    was in default, nearly a year after the first modification had issued. The Rowlands received a

14    certified letter from Chase dated September 7, 2012, which stated that they were in default and

15    $139,627.31 past due on the mortgage.

16        27.    Chase's collection efforts and delinquency notices – ranging from statements to

17    letters to even intrusive, upsetting home visits, created extreme stress and anxiety for the

18    Rowland family.

19        28.    From September, 2012 on, Teresa Rowland wrote Chase repeatedly, describing

20    the emotional distress the inaccurate collection calls, mortgage statements, and default letters

21    were causing, and asked Chase to stop making calls telling her she was in default, finalize the

22    loan and update its systems, and give her accurate information that the loan modification was in

23    place.

24        29.    Teresa Rowland continued to call Chase regularly, asking for updates on the

25    status of the modification. On or about October 26, 2012, the Chase representative told Ms.

26    Rowland that the modification documents should be finalized and ready by November 14, 2012.

27        30.    On November 30, 2012, however, a Chase representative called Teresa Rowland

28    and asked why she had not made a payment in 36 months. He accused her of not responding to

COMPLAINT

Chase and not caring about her loan obligations, making her feel as though her home was in jeopardy.   When she explained that she had been granted a modification a year ago, he denied the existence of the modification, saying he could see no modification in the system, and said that "If we [Chase] don't sign the modification documents, then the loan modification doesn't exist."   Ultimately, she spoke to a supervisor names "Sergio," who stated he would do research and call me back within 5 business days, but he never did.  This extremely upsetting call was right before the Rowland's annual extended family Christmas gathering weekend, and all but ruined the holiday gathering for her.

31.    On December 3, 2012, Ms. Rowland again wrote Chase, describing these interactions and begging Chase to finalize the modification and stop the collection calls demanding payments that were not due.

32.    Chase continued to send collection letters, stating, for example, that the Rowland family was "at risk of losing [their] home" and that "it might be time to sell your home in order to stop the collection calls, avoid foreclosure, find financial peace of mind and make a fresh start These and other collection communications, coupled with the uncertainty, caused the Rowland family immense distress and anxiety.

33.    Teresa Rowland wrote letter after letter to Chase, asking that it finalize her loan modification, and describing the profound stress and anxiety the collection efforts were causing her, including letters on September 15, 2012, December 3, 2012, and December 17, 2012.

34.    In January, 2013, Chase representative John Baylog called Ms. Rowland, stating that he was assigned to respond to her most recent letter, and had spent several hours researching why the modification was delayed.  He stated, among other things, that the loan was "with escrow" and was "awaiting management approval."  Ms. Rowland was shocked, as she had been told for well over a year that the loan modification had been approved and in place.

35.    Despite Chase's ongoing assurances that the modification was being finalized, the Rowland family received multiple letters from Chase entitled "Notice of Intent to Foreclose," or stating that the property might be referred to foreclosure.  At least three of these letters, dated November 5, 2012, December 11, 2012, and February 28, 2013, stated that according to Chase's

7

COMPLAINT

records. "You have stated that you are not interested in pursuing an available loan modification or you have not accepted our loan modification offer." (An October 9, 2012 letter stated that Chase had been unable to contact Ms. Rowland to consider her for a loan modification).  The letters claimed that the account was increasingly overdue:  the October 9, 2012 letter, for example, stated the account was $140,281.40 in arrears, and the February 28, 2013 letter stated the account was $142,215.20 in arrears.  In March, 2013, Teresa Rowland received a letter stating that her loan modification and escrow account had been terminated.  She again wrote Chase on March 14, 2013, describing the physical as well as emotional toll that the uncertainty and fear were taking on her and her family.

36.     Throughout March and April, 2013, Chase representatives told the Rowland family that the modification was apparently bouncing back and forth between a "remediation team" and the underwriting and closing departments.  At one point, Mr. Baylog told Ms. Rowland that the file was "so old" that the modification had to be reworked.

37.     On May 13, 2013, Teresa Rowland received a third set of loan modification documents.  This third permanent HAMP modification had completely different - and much worse - terms.  The modification was to take effect on July 1, 2013 - giving the Rowland family no credit for nearly two years of timely payments.  The unpaid principal balance would be $823,792.17.  Although $142,400 of that amount would be non-interest bearing, the agreement made no mention of principal forgiveness at all.  The interest rate would begin at 2%, and step up to 4.75% in 2020.  Although the maturity date remained the same, the balloon payment had increased by over $170,000 to $351,573.42.

38.     Over the next several months, Chase representatives admitted that the third modification had mistakenly omitted principal reduction; they called repeatedly, and pointlessly, to "follow up," but had no information to share about the status of the loan.  Teresa Rowland continued to write Chase every several weeks to request that Chase complete the modification.  She ultimately asked Chase to stop calling unless it had new information to offer, as the calls were so frustrating.

39.     Chase sent a fourth set of modification documents dated July 10, 2013.  This

8

modification more or less mirrored the original loan modification terms. The agreement changed the interest rate retroactively to December 1, 2011. It deferred $145,728.69 of the unpaid principal balance, and made $114,928.69 of that balance eligible for forgiveness. The balloon payment was back to $181,648.14. Teresa Rowland signed and returned the agreement on or about July 22, 2013.

40.     Chase summarized its errors this way in an August 6, 2013 letter to Teresa Rowland:

"Our records show that we initially approved your loan for a Home Affordable Modification Program (HAMP) trial period on February 16, 2011, with three monthly payments of $2,813.17 each due on April 1, 2011, May 1, 2011, and June 1, 2011. You successfully completed the trial period plan, and your file was submitted to underwriting to be reviewed for a permanent loan modification in June 2011.

"A permanent HAMP modification was approved on August 8, 2011, which you signed and returned our office, but the documents could not be approved due to a calculation error in the escrow portion of the documents. The file was reworked, and new documents were sent to you on October 18, 2011, which you signed and returned on October 27, 2011. However, a review of the documents again showed that we had inadvertently calculated your escrow incorrectly, and the modification could not be finalized.

"A new set of HAMP documents were generated, and these updated documents were sent to you on January 19, 2012, and again on January 24, 2012. You signed the documents and returned them to our office on February 8, 2012; however the loan modification could again not be executed due to errors on the documents. Our notes stated that discrepancies were found in calculations regarding the escrow shortage, the unpaid principal balance and the current due date listed in the documents.

"The file remained in remediation throughout 2012 as we attempted to correct the errors in the documents, and the calculation errors in the documents were not corrected until a new copy of the documents was mailed to you May 10, 2013.

"Upon receipt of the documents, you disputed the terms being offered to you, and our review of the documents confirmed that we had not offered you the correct terms. We sent the documents again for a remediation review to correct the errors, and the review was completed on July 10, 2013, at which time a corrected version of the final modification documents were sent to you."

41.     The Rowlands' saga was not over, however.  Servicing of the Rowlands' loan was transferred from Chase to Select Portfolio Servicing starting August 1, 2013.

9

COMPLAINT

42.     Correspondence that the Rowland family received from SPS made no mention of the modification at all.   For instance, an August 20, 2013 letter from SPS discussed a rate change under the old, negatively amortizing loan terms; a statement listed $2,585.09 in "FC Costs" - - presumably foreclosure costs -- charged to the loan account.

43.     On August 26, 2013, Teresa Rowland sent a written complaint to SPS, describing the ongoing servicing error, demanding that it honor the modification, strip the unlawful fees, and ensure that the Rowland Family receive the principal reductions and HAMP incentives to which they should have been entitled.

44.     Although SPS has indicated that it intends to honor the loan modification and implement it by the end of October, to date, it has not done so, and has sent multiple account notices based on the pre-modification terms and a letter encouraging the Rowland family to apply for "foreclosure alternatives" such as short sale or deed in lieu of foreclosure.  On October 10, 2013, an SPS representative indicated that the account was paid only through February, 2012.

45.     Through Defendants' lengthy history of outrageous conduct related to their loan and the threatened loss of their home, Plaintiffs have suffered substantial damages, including but not limited to monetary damages from misapplied credit, charges for interest they do not owe, and unwarranted foreclosure and other fees.   Their loan principal has not been reduced, as promised by the HAMP Modification they entered into in October, 2011.  They have not received the $2,000 "incentive credits" they should be due for their timely payments under the HAMP program on the anniversary of the start of their trial modification (April 2012 and 2013).

46.     The conduct described above has also caused enormous emotional distress, psychological harm, and physical effects for both Plaintiffs, including, but not limited to, for Teresa Rowland, extreme stress, inability to concentrate, sleeplessness, irritability, marital conflict, increased blood pressure, heart palpitations, stomach cramps, and crying spells:   for Brian Rowland, increased stress, increased blood pressure, humiliation, embarrassment, sleeplessness, irritability, marital conflict, diarrhea, depression, anger, and frustration.

47.     Defendants' acts set out above were made in conscious disregard of Plaintiffs'

10

COMPLAINT

rights.

## FIRST CAUSE OF ACTION
### Breach of Contract – Breach of the Modification Agreement
### By Plaintiff Teresa Rowland Against All Defendants

48.     Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

49.     In October, 2011, Teresa Rowland entered into a valid contract for permanent modification of the mortgage encumbering Plaintiffs' home with defendant Chase, acting as the servicer and agent for defendant U.S. Bank, N.A., trustee of the mortgage backed security that owns the loan. The contract was formed when Plaintiff accepted Chase's written offer to modify by signing and notarizing the October, 2011 Modification Agreement and returning it to Chase.

50.     Plaintiff performed her obligations under the Modification Agreement. She signed and notarized the agreement, timely returned, and made monthly payments under the Agreement at the amount required, from December, 2011 to the present.

51.     All conditions precedent to the Agreement have been met or have been waived by Chase's acceptance of payments under the Modification Agreement, coupled with its assurances that the Agreement was in place.

52.     Because Plaintiff met all of the conditions under the Modification Agreement, Chase was obligated under the loan modification agreement to bring the loan current, to accept the Rowland family's monthly payments as timely, and to credit them accordingly.

53.     Chase breached the Agreement by failing to bring Plaintiff's loan current, and by failing to properly credit the timely payments. Instead, Chase, acting as agent for defendant U.S. Bank, N.A., continued to claim that the Rowlands were delinquent. Even though Chase has ostensibly been taking steps to correct the account since February, 2012, it did not implement the contract, and as a consequence, the Rowland family has been subjected to demands for payment to keep their home in an amount they do not owe from defendant U.S. Bank's subsequent servicer and agent, SPS.

54.     Defendants' breach of the October, 2011 Modification Agreement caused Plaintiff damages in an amount to be determined at trial.

11

COMPLAINT

## SECOND CAUSE OF ACTION
### Promissory Estoppel
**By Teresa and Brian Rowland Against Defendants Chase and U.S. Bank, N.A.**

55.     Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

56.     Through the Modification Agreement and subsequent oral communications stating that the loan modification was in place and instructions to continue payments in the amounts specified in the loan agreement, Defendants clearly and unambiguously promised Plaintiffs they would modify the loan, change its terms, and accept the modified payments in full.

57.     Plaintiffs relied on Defendants' promises under the Modification Agreement by making loan payments in the amount demanded and by refraining from taking alternative measures to save their home.

58.     Plaintiffs' reliance on the promises contained in the Modification Agreement and oral promises was both reasonable and foreseeable.

59.     Plaintiffs were substantially injured by their reliance on the Modification Agreement and the concomitant oral confirmation of that agreement because it caused, among other things, imposition of fees and arrears that have increased the unpaid balance of the loan encumbering their home, missed reduction of the principal amount of the loan encumbering their home, and emotional distress.

## THIRD CAUSE OF ACTION
### Violation of the Real Estate Settlement and Procedures Act, 12 U.S.C. §§ 2601, et seq.
**By Plaintiff Teresa Rowland Against Defendants Chase and SPS**

60.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

61.     The Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, *et seq.* imposes a duty to respond to consumer complaints that an account is in error and to make appropriate corrections to the account.

62.     12 U.S.C. § 2605(e) provides that upon receipt of written correspondence from a

12

COMPLAINT

borrower that asserts the account is in error (a "Qualified Written Request" or "QWR"), a servicer must, within 60 business days, make appropriate corrections in the account and notify the borrower of the corrections, or investigate, and provide the borrower with a written explanation why the servicer believes the account is correct, or state why the information is unavailable. The statute creates a private right of action for violation of these requirements, 12 U.S.C. § 2614, and allows for statutory and actual damages and award of fees and costs for violation thereof.

63.     Teresa Rowland made multiple Qualified Written Requests within the meaning of 12 U.S.C. § 2605(e)(1)(B) with her letters to Chase, including, among others, her letters of September 15, 2012, December 3, 2012, December 17, 2012, January 5, 2013, March 14, 2013, May 2, 2013, and June 30, 2013. These letters, alone and collectively, described Chase's and SPS's ongoing failure to implement the modification, continued wrongful collection efforts and threats to foreclose, and the emotional toll they were taking on the Rowland family. To the extent that any of these letters did not technically meet every requirement for a Qualified Written Request under the statute, Chase waived those requirements by stating it would investigate, requesting additional time to respond, and, on information and belief, treating the letters as Qualified Written Requests.

64.     Although Chase responded by letter dated August 6, 2013, its response was not timely. Moreover, Chase failed to make appropriate corrections to the account in a timely or effective fashion.

65.     Chase violated RESPA, 12 U.S.C. § 2605(e)(3), by providing information to a consumer reporting agency regarding overdue payments allegedly owed by the Plaintiff that were related to her Qualified Written Requests.

66.     Chase has a business plan and practice of failing to adequately respond to qualified written requests, as evidence by its failure to respond timely or effectively to Ms. Rowland's several letters.

67.     Teresa Rowland's August 26, 2013 letter to SPS was a Qualified Written Request within the meaning of 12 U.S.C. § 2605(e)(1)(b).   SPS violated RESPA, 12 U.S.C. §

13

1    2605(e)(2), by failing to make appropriate corrections to her account in response to her Qualified

2    Written Request, or to investigate and explain why it would or could not do so, as required by 12

3    U.S.C. § 2605(e)(2). SPS also failed to provide a timely response to the QWR.

4         68.    As a result of Chase and SPS's violations of RESPA, Plaintiff has suffered

5    damages, including improper charges and fees on the loan secured by her home and emotional

6    distress, in an amount to be determined at trial.

7                           **FOURTH CAUSE OF ACTION**
                                      **Negligence**
8               **By Teresa and Brian Rowland Against Defendant Chase**

9         69.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as

10   though fully set forth herein.

11        70.    Chase's conduct described above constituted negligence.

12        71.    Chase negligently inflicted emotional distress.

13        72.    Defendant owed Plaintiffs a duty of ordinary care as the servicer of the mortgage

14   encumbering their home. Courts have historically been reluctant to impose a duty of care on the

15   arm's length relationship between lenders and borrowers. However, in recent years, both

16   California and federal courts have recognized that the complex relationship between

17   homeowners and the modern mortgage loan servicer who perform collection and loss mitigation

18   functions encompasses far more than a simple loan transaction, and can give rise to a duty of

19   care, particularly where the servicer undertakes processing of a loan modification.

20        73.    In performing the acts and omissions outlined above, Chase breached its duty of

21   care to Plaintiffs. Among other things, and without limiting the generality of the foregoing,

22   Chase breached its duty by:

23               A. Agreeing to and then failing to honor not one but multiple modification

24                  agreements with Plaintiffs;

25               B. Accepting Plaintiffs' monthly payments under the October, 2011

26                  permanent modification and then claiming that the modification had

27                  never been booked;

28               C. Refusing to communicate honestly and accurately with Plaintiffs about

COMPLAINT

the status of their loan modification;

D. Harassing Plaintiffs with debt collection notices, calls, and home visits when they were, in fact, current on their mortgage and repeatedly requested that collection calls and letters cease;

E. Failing to timely correct the errors listed above after being repeatedly notified of the problems;

F. Misrepresenting Plaintiffs' account to credit reporting agencies;

G. Failing to use ordinary care in performing the transactions described herein, including but not limited to modification and handling of escrow;

H. Failing to competently supervise and monitor its agents and employees; and/or

I. Failing to meet the industry standard of care in performing the transactions described herein.

J. Chase furnished false information to credit reporting agencies with malice or willful intent to injure.

74. Chase's wrongful conduct described above actually and proximately caused the Plaintiffs economic harm and extreme emotional distress.

75. It was clearly foreseeable that Chase's actions described above would cause Plaintiffs economic harm and extreme emotional distress.

76. As a direct and proximate result of Chase's unlawful conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

77. Chase acted with willful disregard for Plaintiffs' rights, oppression, and/or malice, thereby entitling Plaintiffs to punitive damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Invasion of Privacy**
**By Teresa and Brian Rowland Against Defendant Chase**

78. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

15

COMPLAINT

79.     Defendant Chase's outrageous, abusive, and malicious acts constituted intrusion upon Plaintiffs' seclusion.

80.     Defendant intruded upon the solitude or seclusion, private affairs or concerns of Plaintiffs.

81.     The intrusion was substantial, and of a kind that would be highly offensive to an ordinarily reasonable person.

82.     The intrusion caused Plaintiffs to sustain injury, damage, loss or harm in the form of emotional distress and actual injury as described above.

83.     Defendant's wrongful conduct as described herein actually and proximately caused the Plaintiffs harm as described above.

84.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

85.     Chase furnished false information to credit reporting agencies with malice or willful intent to injure.

86.     Defendant acted with oppression, and/or malice, thereby entitling Plaintiffs to punitive damages in an amount according to proof and a finder of fact at trial. Defendant acted in a despicable manner and acted with a conscious disregard to rights of Plaintiffs.

**SIXTH CAUSE OF ACTION**
**Consumer Credit Reporting Act, Civil Code § 1785.1 et seq.**
**By Plaintiff Teresa Rowland Against Defendant Chase**

87.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

88.     Chase has reported to at least one credit reporting agency, Experian, that Teresa Rowland was 180 days late on her mortgage loan from November, 2011 to April, 2013, when in fact she made timely monthly payments of $2,813.17 and was current for that entire period. The reports to Experian also incorrectly list the amount due each month from November 2011 to May 2013, with the incorrect amounts due ranging from $3,055 to $4,272 per month. The amount paid for each month was incorrectly reported for January 2012, April through December, 2012, and January, April, and May 2013.

COMPLAINT

89.     California's Civil Code § 1785.25(a) states that a "person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate."

90.     Chase negligently and willfully furnished information to the credit reporting agencies that it knew or should have known was incomplete, inaccurate, and misleading, but nevertheless has reported and continue to report Plaintiff's' mortgage as in default.

91.     In its willful reporting of inaccurate credit information, Chase was guilty of oppression, fraud, and malice as those terms are defined in Civil Code § 3294 (a).

92.     Based on these violations of Civil Code § 1785.25(a), Plaintiff is entitled to the remedies afforded her by Civil Code § 1785.31, including actual damages, pain and suffering, punitive damages, injunctive relief, and attorney's fees.

## SEVENTH CAUSE OF ACTION
### Rosenthal Fair Debt Collection Practices Act , Cal. Civil Code §§ 1788, et seq
### By Plaintiff Teresa Rowland Against Defendant Chase

93.     Plaintiffs incorporate all other paragraphs as though fully set forth herein.

94.     Chase is a "debt collector" within the meaning of Civil Code §1788.2(c).   The monies which defendant sought to collect from Plaintiff is a "debt" within the meaning of Civil Code §1788.2(d).

95.     Chase communicated by telephone or in person with Plaintiff with such frequency as to be unreasonable and which constituted harassment to the Plaintiff under the circumstances.  Chase telephoned Plaintiff well more than fifty (50) times after being requested to cease, and made unnecessary field visits to the family home, in violation of  Civil Code § 1788.11(e).

96.     Chase, as alleged above, represented to Plaintiff that the loan balance could be increased by finance charges, default related charges, and other charges when no such charges could be included, in violation of Civil Code § 1788.13(e).

97.     The debt collection practices of Chase violated other provisions of the Rosenthal Fair Debt Collection Practices Act, including to but not limited to Civil Code §1788.17, which incorporates by reference, and requires compliance with the provisions of the federal FDCPA,

17

COMPLAINT

including:

     A.     15 U.S.C. §1692e, which prohibits any false, deceptive or misleading representation or means in connection with the collection of any debt

     B.     15 U.S.C. §1692e(2)(A), which prohibits misrepresentation of the character, amount, or legal status of the debt;

     C.     15 U.S.C. §1692e(10), which prohibits the use of any false representation or deceptive means to collect or attempt to collect any debt;

     D.     15 U.S.C. §1692f, which prohibits any unfair or unconscionable means to collect or attempt to collect any debt;

     E.     15 U.S.C. §1692f(1), which prohibits the collection of any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

98.     Chase has a business plan and practice of failing to cease and desist the conduct above in order to collect more money on loans secured against property.

99.     Chase's violations were willful and knowing.

100.     As a result of Chase's violations of the Rosenthal FDCPA, Plaintiff suffered actual damages and emotional distress, in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
**Unfair Business Practices (Violation of Cal. Bus. & Prof. Code §§ 17200, et. seq.)**
**By Teresa and Brian Rowland Against All Defendants**

101.     Plaintiffs incorporate by reference all of the foregoing paragraphs as if set forth herein.

102.     Business & Professions Code §17200, et seq., the "Unfair Competition Law" ("UCL") defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice.   The UCL authorizes this Court to issue whatever orders or judgments may be necessary to prevent unfair or unlawful practices, or to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." *Id.* § 17203.

18

COMPLAINT

103.    Defendants committed "unlawful" business acts or practices by, among other things, inducing Plaintiffs to rely on their promises to their detriment, breaching of the covenant of good faith and fair dealing inherent in the Note, Deed of Trust, and Modification Agreement, breaching their duty of care, unlawfully making derogatory credit reports, and violating the Rosenthal Fair Debt Collection Practices Act, as alleged in this Complaint.

104.    Defendants committed "unfair" business acts and practices, including but not limited to unlawfully attempting to collect debt which Plaintiffs did not owe, threatening to foreclose on Plaintiffs' home despite having received their payments under the Modification Agreement; by failing to inform Plaintiffs of Chase's repudiation of its Modification Agreement in a timely fashion; by failing to rectify its errors in a timely fashion by immediately ceasing its harassing collection efforts, removing unwarranted interest and fees from Plaintiffs' account, and implementing the Modification Agreement or equivalent modification, and by failing to communicate with Plaintiffs in an accurate, consistent manner.

105.    The Court's intervention is necessary to halt and remedy Defendants' unlawful and unfair acts and practices.

106.    Plaintiffs seek restitution, declaratory relief, and injunctive relief pursuant to Bus. and Prof. Code § 17203, including but not limited to an Order restraining Defendants U.S. Bank and SPS from foreclosing Plaintiffs' home, requiring Defendants to either honor the Modification Agreement or to provide a suitable alternative; and granting such other and further relief as the Court may deem proper and just.

107.    WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    Statutory, actual and punitive damages;

2.    For equitable relief, including an Order requiring Defendants' performance under the 2011 Modification Agreement;

3.    For injunctive relief against Defendants U.S. Bank and SPS to prevent the foreclosure sale of Plaintiffs' home;

19

1    4.     For restitution of wrongfully imposed fees and charges;

2    5.     For an award of attorney's fees, litigation expenses, and costs of suit; and

3    6.     For such other and further relief as the court may deem proper.

DATED: December 5, 2013        HOUSING AND ECONOMIC RIGHTS
                           ADVOCATES
                           CONSUMER LAW OFFICE OF WILLIAM E.
                           KENNEDY

             By                                 
                       ELIZABETH S. LETCHER
                       Attorneys for BRIAN AND TERESA ROWLAND

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

DATED: December 5, 2013        HOUSING AND ECONOMIC RIGHTS
                           ADVOCATES
                           CONSUMER LAW OFFICE OF WILLIAM E.
                           KENNEDY

             By                                 
                       ELIZABETH S. LETCHER
                       Attorneys for BRIAN AND TERESA ROWLAND

20

COMPLAINT

**EXHIBIT A**

MIN: 5775                    Loan Number: 6286

# ADJUSTABLE RATE NOTE
## (MTA-Twelve Month Average Index - Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.  THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.

AUGUST 22, 2006            SHERMAN OAKS              CALIFORNIA
[Date]                         [City]                      [State]

459 WASHBURN DRIVE, FREMONT, CALIFORNIA 94536
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 648,000.00            (this amount is called "Principal"), plus interest, to the order of Lender.  The Principal amount may increase as provided under the terms of this Note but will never exceed ONE HUNDRED TEN AND 000/1000
(       110.000   %) of the Principal amount I originally borrowed.  This is called the "Maximum Limit."
Lender is METROCITIES MORTGAGE LLC DBA NO RED TAPE MORTGAGE, A
LIMITED LIABILITY COMPANY
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note.  Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

(A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of        7.750   %.  The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B) Interest Rate Change Dates

The interest rate I will pay may change on the 1st    day of OCTOBER, 2006
and on that day every month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date."  The new rate of interest will become effective on each Interest Rate Change Date.  The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 125/1000                        percentage point(s) (      3.125 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition up to the nearest one-eighth of one percentage point (0.125%). The rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than       9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3.   PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the      1st        day of each month beginning on OCTOBER 1, 2006    . I will make these payments every month until I have paid all of the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to Interest before Principal.   If, on SEPTEMBER 1, 2046     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   15301 VENTURA BLVD STE D300, SHERMAN OAKS, CALIFORNIA 91403
                                        or at a different place if required by the Note Holder.

(B) Amount of My Initial Minimum Monthly Payments

Each of my initial minimum monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,638.51       as calculated by the Note Holder at an interest rate of      1.000 %, unless adjusted under Section 3(F).   This is the Minimum Payment amount the Note Holder will accept as provided by Section 3(C) below.

(C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the   1st      day of OCTOBER, 2007       , and on that day every 12th month thereafter.  Each of these dates is called a "Payment Change Date."  My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.  The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date.  The result of this calculation is called the "Full Payment."  Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment."  Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.  I also have the option to pay the Full Payment for my monthly payment.

(E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater

than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

(F)  Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a Maximum Limit equal to ONE HUNDRED TEN AND 000/1000                                            percent (   110.000  %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G)  Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my Minimum Payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

(H)  Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

      (i)   Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

      (ii)  Fully Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

      (iii) 15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

## 4.  NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.  BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

PayOption ARM Note MTA Index
FE-5312R (0412)  04/05                              Page 3 of 6                         DocMagic *eForms* 800-649-1362
www.docmagic.com

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000   % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
TERESA  ROWLAND                -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                              -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                              -Borrower                                              -Borrower

PayOption ARM Note MTA Index
FE-5312R (0412)  04/05                    Page 6 of 6                    DocMagic *eForms* 800-849-1362
                                                                        www.docmagic.com

MIN: 5775          Loan Number: ▓▓7286

# PREPAYMENT NOTE ADDENDUM
## (Multi-State)

This Prepayment Note Addendum is made this 22nd day of AUGUST, 2006 and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") made by the undersigned (the "Borrower") to evidence indebtedness to METROCITIES MORTGAGE LLC DBA NO RED TAPE MORTGAGE, A LIMITED LIABILITY COMPANY (the "Lender"), which debt is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at 459 WASHBURN DRIVE, FREMONT, CALIFORNIA 94536

(the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender covenant and agree that, the provisions of the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" are amended to read as follows:

Subject to the Prepayment penalty provided below, I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." A "Full Prepayment" is the prepayment of the entire unpaid Principal due under the Note. A payment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

If, within the 12 month(s) period beginning with the date I execute the Note (the "Penalty Period"), I make a Full Prepayment, or Partial Prepayment in any twelve (12)-month period that exceeds 20% of the original Principal loan amount, I will pay a Prepayment charge as consideration for the Note Holder's acceptance of such Prepayment. The Prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original Principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the Prepayment, unless otherwise prohibited by applicable law or regulation. No Prepayment charge will be assessed for any prepayment occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first 12 month(s) of the term of the Note, no Prepayment penalty will be assessed. In that event, I agree to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

The Note Holder will apply all Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a Partial Prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If my Note is an Adjustable Rate Note, Partial Prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the Partial Prepayment. However, any reduction due to my Partial Prepayment may be offset by an interest rate increase.

The Note Holder's failure to collect a Prepayment charge at the time a Prepayment is received shall not be deemed a waiver of such charge. Any Prepayment charge not collected at the time the Prepayment is received shall be payable on demand.

All other provisions of the Note are unchanged and remain in full force and effect.

### NOTICE TO BORROWER

Do not sign this Addendum before you read it. This Addendum provides for the payment of a Prepayment charge if you wish to repay the loan prior to the date provided for repayment in the Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED:

_____ (Seal)          _____ (Seal)
TERESA  ROWLAND          -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                         -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                         -Borrower                                  -Borrower

MIN: 5775          Loan Number: 5286

# PREPAYMENT PENALTY DISCLOSURE
### (Multi-State)

Loan Applicant(s):  TERESA ROWLAND

Property Address:  459 WASHBURN DRIVE, FREMONT, CALIFORNIA 94536

You are entering into a residential mortgage loan that will be secured by the property referenced above. The terms of your loan provide for the payment of a prepayment charge in the event that you prepay the loan in full during the first  12  month(s) of the term of the Note.

If, within the  12  month(s) period beginning with the date you execute the Note (the "Penalty Period"), you make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment charge will be assessed for any prepayment made after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first  12  month(s) of the term of the Note, no prepayment penalty will be assessed. In that event, you must provide the Note Holder with evidence acceptable to the Note Holder of such sale. For purposes of this exception to the prepayment charge, a sale of the property to a person or entity with whom you have a personal or business relationship (such as a family member, builder, developer or employer) will be presumed NOT to be a bona fide sale of the Property to an unrelated third party.

ACKNOWLEDGMENT:  I/We hereby acknowledge receiving this disclosure at the time of loan approval/commitment.

_____  _____  _____  _____
Borrower TERESA ROWLAND      Date     Borrower                    Date


_____  _____  _____  _____
Borrower                    Date     Borrower                    Date


_____  _____  _____  _____
Borrower                    Date     Borrower                    Date

MIN: _____5775                    Loan Number: ____5286

# PREPAYMENT RIDER
## (Multi-State)

This Prepayment Rider is made this 22nd day of AUGUST, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to METROCITIES MORTGAGE LLC DBA NO RED TAPE MORTGAGE, A LIMITED LIABILITY COMPANY                (the "Lender") of the same date and covering the property described in the Security Instrument and located at
459 WASHBURN DRIVE, FREMONT, CALIFORNIA 94536

(the "Property").

Additional Covenants. Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." A "full prepayment" is the prepayment of the entire unpaid principal due under the Note. A payment of only part of the unpaid principal is known as a "partial prepayment."

If, within the   12   month(s) period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, Borrower will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first   12   month(s) of the term of the Note, no prepayment penalty will be assessed. In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower
TERESA ROWLAND

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

Recording Requested By:
METROCITIES MORTGAGE LLC DBA NO
RED TAPE MORTGAGE

And After Recording Return To:
METROCITIES MORTGAGE LLC DBA NO
RED TAPE MORTGAGE
15301 VENTURA BLVD STE D300
SHERMAN OAKS, CALIFORNIA 91403
Loan Number: 16025286

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

**MIN:** 100034200057325775

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   AUGUST 22, 2006           , together with all Riders to this document.
(B) "Borrower" is   TERESA ROWLAND, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument.
(C) "Lender" is   METROCITIES MORTGAGE LLC DBA NO RED TAPE MORTGAGE

Lender is a   LIMITED LIABILITY COMPANY                              organized
and existing under the laws of   CALIFORNIA
Lender's address is   15301 VENTURA BLVD STE D250, SHERMAN OAKS,
CALIFORNIA 91403

(D) "Trustee" is   FIDELITY NATIONAL LOAN PORTFOLIO SOLUTIONS, A CALIFORNIA CORPORATION
2520 N. FOTHILL AVENUE, STE. 120, SANTA ANA, CALIFORNIA 92705

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated   AUGUST 22, 2006
The Note states that Borrower owes Lender   SIX HUNDRED FORTY-EIGHT THOUSAND AND
00/100                              Dollars (U.S. $ 648,000.00        ) plus interest.

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than SEPTEMBER 1, 2046.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider ☐ Planned Unit Development Rider
☐ Balloon Rider ☐ Biweekly Payment Rider
☐ 1-4 Family Rider ☐ Second Home Rider
☐ Condominium Rider ☒ Other(s) [specify]:
　　　　　　　　　　　　　PREPAYMENT RIDER

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of ALAMEDA :
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 507-0226-007

which currently has the address of    459 WASHBURN DRIVE
[Street]

FREMONT                    , California    94536    ("Property Address"):
[City]                                     [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   2.   Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   3.   Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These

agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The

notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
TERESA ROWLAND                -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

Witness:                      Witness:

_____    _____

State of California                )
                                   ) ss.
County of  ALAMEDA                 )

    On                            before me.

personally appeared    TERESA  ROWLAND

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
NOTARY SIGNATURE

_____
(Typed Name of Notary)

        NOTARY SEAL

Loan Number: ███5286

Date: AUGUST 22, 2006

Property Address:   459 WASHBURN DRIVE, FREMONT, CALIFORNIA 94536

## EXHIBIT "A"

## LEGAL DESCRIPTION

A.P.N. # : 507-0226-007

DocMagic EFforms 800-649-1362
www.docmagic.com

MIN: 5775          Loan Number: 5286

# ADJUSTABLE RATE RIDER
## (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this 22nd day of AUGUST 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

459 WASHBURN DRIVE, FREMONT, CALIFORNIA 94536
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2.  INTEREST
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    7.750  %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.
(B) Interest Rate Change Dates
The interest rate I will pay may change on the 1st day of OCTOBER 2006 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.
(C) Index
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently

---

available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 125/1000                    percentage point(s) (        3.125 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition up to the nearest one-eighth of one percentage point (0.125%). The rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than        9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay Principal and Interest by making a payment every month.

I will make my monthly payments on the    1st        day of each month beginning on OCTOBER 1, 2006      . I will make these payments every month until I have paid all of the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on SEPTEMBER 1, 2046        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 15301 VENTURA BLVD STE D300, SHERMAN OAKS, CALIFORNIA 91403
                                        or at a different place if required by the Note Holder.

(B) Amount of My Initial Minimum Monthly Payments

Each of my initial minimum monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,638.51        as calculated by the Note Holder at an interest rate of 1.000  %, unless adjusted under Section 3(F). This is the Minimum Payment amount the Note Holder will accept as provided in Section 3(C) below.

(C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the   1st     day of OCTOBER, 2007            , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5%

PayOption MTA ARM Rider
FE-5315R (0412) 04/05                          Page 2 of 5                    DocMagic *eFormts* 800-649-1362
                                                                              www.docmagic.com

limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

(E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

(F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to ONE HUNDRED TEN AND 000/1000 percent ( 110.000 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that maximum amount due to the Limited Payment and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the current interest rate.

(G) Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

(H) Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

    (i)    Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

    (ii)    Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

    (iii)    15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4.   NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PayOption MTA ARM Rider
FE-5315R (0412) 04/05                    Page 4 of 5                    DocMagic *eRorms* 800-649-1362
www.docmagic.com

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
TERESA  ROWLAND           -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

# EXHIBIT B



Loan Number ██████183

# HOME AFFORDABLE MODIFICATION AGREEMENT

MIN: ██████5775

Borrower ("I"):[1] TERESA ROWLAND
Lender or Servicer ("Lender"): JPMORGAN CHASE BANK, N.A.
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): AUGUST 22, 2006
Loan Number: 5303911183
Property Address ("Property"): 459 WASHBURN DR, FREMONT, CALIFORNIA 94536

"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.

If my representations and covenants in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.   **My Representations and Covenants.** I certify, represent to Lender, covenant and agree:

   A.   I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B.   One of the borrowers signing this Agreement lives in the Property as a principal residence, and the Property has not been condemned;

   C.   There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

   D.   I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification Program ("Program"));

   E.   Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

---

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

HOME AFFORDABLE MODIFICATION AGREEMENT with PRA 09-15-2011    ver. 10_11_2011_11_53_15

*(page 1 of 9 pages)*



Loan Number 1183

F.   If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

G.   I have made or will make all payments required under a trial period plan.

H.   If I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2.   **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

A.   If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

B.   I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.   **The Modification.** If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **DECEMBER 01, 2011** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a trial period plan, this modification will not take effect. The first modified payment will be due on **DECEMBER 01, 2011.**

A.   The Maturity Date will be: **SEPTEMBER 01, 2046.**

B.   The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$819,645.76** (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.   **$151,245.76** of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and will be treated as a non-interest bearing principal forbearance. I will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, **$120,445.76** of the Deferred Principal Balance is eligible for forgiveness (the "Deferred" Principal Reduction Amount"). Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of **APRIL 01, 2011**, the Lender shall reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal Reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal

HOME AFFORDABLE MODIFICATION AGREEMENT with PRA 09-15-2011   ver. 10_11_2011_11_53_15

*(page 2 of 9 pages)*



Balance" and this amount is $668,400.00. Interest at the rate of 2.000% will begin to accrue on the Interest Bearing Principal Balance as of NOVEMBER 01, 2011 and the first new monthly payment on the Interest Bearing Principal Balance will be due on DECEMBER 01, 2011. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins on | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|-------------------------------------------|------------------------|-------------------|----------------------------|
| 1-5   | 2.000%        | 11/01/2011                | $2,024.09                                     | $789.08 May adjust periodically           | $2,813.17 May adjust periodically | 12/01/2011        | 60                         |
| 6     | 3.000%        | 11/01/2016                | $2,351.52                                     | May adjust periodically                   | May adjust periodically | 12/01/2016        | 12                         |
| 7-34  | 4.000%        | 11/01/2017                | $2,697.14                                     | May adjust periodically                   | May adjust periodically | 12/01/2017        | 346                        |

Notwithstanding the foregoing schedule, I agree that unless sooner paid, I will have a final balloon payment in the amount of $181,648.14 due and payable on the New Maturity Date.

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step, or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan.   My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest being added to the outstanding principal balance.

I further understand that, provided I am not in default under the terms of this Agreement and I pay my Note in full (i) any time more than 30 calendar days after the Modification Effective Date, and (ii) prior to the application of the entire Deferred Principal Reduction Amount, I shall be fully vested in and entitled to the unapplied amount of the Deferred Principal Reduction Amount and the unapplied amount shall be deducted from my payoff balance.

D.   I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

HOME AFFORDABLE MODIFICATION AGREEMENT with PRA 09-15-2011     Ver. 10_11_2011_11_53_15





E. If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F. I agree to pay in full the Deferred Principal Balance less any Deferred Principal Reduction Amount to which I am entitled, and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

4. **Additional Agreements.** I agree to the following:

A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B. That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. Intentionally Deleted.

E. That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my

HOME AFFORDABLE MODIFICATION AGREEMENT with PRA 09-15-2011    ver. 10_11_2011_11_53_15



Loan Number ▆▆▆11183

property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I. That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective document, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

L. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to

HOME AFFORDABLE MODIFICATION AGREEMENT with PRA 09-15-2011   ver. 10_11_2011_11_53_15



execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

P. If my Loan Documents govern a home equity loan or line of credit, then I agree that as of the Modification Effective Date, I am terminating my right to borrow new funds under my home equity loan or line of credit. This means that I cannot obtain additional advances, and must make payments according to this Agreement. (Lender may have previously terminated or suspended my right to obtain additional advances under my home equity loan or line of credit, and if so, I confirm and acknowledge that no additional advances may be obtained.)

### (SIGNATURES CONTINUE ON FOLLOWING PAGES)

Loan Number ████11183

## TO BE SIGNED BY LENDER ONLY

LENDER SIGNATURE PAGE TO HOME AFFORDABLE MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. And TERESA ROWLAND, LOAN NUMBER 5303911183 WITH A MODIFICATION EFFECTIVE DATE OF December 01, 2011

In Witness Whereof, the Lender has executed this Agreement.

Lender

**JPMORGAN CHASE BANK, N.A.**

By: _____

Date: _____

Mortgage Electronic Registration Systems, Inc.

By: _____

Date: _____

State of COLORADO
County of DENVER

The foregoing instrument was acknowledged before me this _____ day of _____. _____ by _____, Vice President of JPMORGAN CHASE BANK, N.A., a national banking association.

[SEAL]

_____
(signature of person taking acknowledgment)

_____
(title or rank)

_____
(serial number, if any)

My Commission expires: _____

HOME AFFORDABLE MODIFICATION AGREEMENT with PRA 09-15-2011    ver. 10_11_2011_11_53_15
*(page 8 of 9 pages)*



Loan Number      ███1183

State of COLORADO
County of DENVER

The foregoing instrument was acknowledged before me this _____ day of _____.
_____ by _____ the   Assistant
Secretary of Mortgage Electronic Registrations Systems, Inc.

[SEAL]

_____
(signature of person taking acknowledgment)

_____
(title or rank)

_____
(serial number, if any)

My Commission expires: _____

Loan Number ████11183

 Here is a summary of your modified mortgage.

**NEW PRINCIPAL BALANCE.** Any past due amounts as of the end of the trial period, including unpaid interest, real estate taxes, insurance premiums, and certain assessments paid on your behalf to a third party, will be added to your mortgage loan balance. In addition, your mortgage insurance premium may increase as a result of the higher mortgage loan balance. If you fulfill the terms of the trial period including, but not limited to, making any remaining trial period payments, we will waive ALL late charges that have accrued and remain unpaid at the end of the trial period.

**INTEREST RATE.** The interest rate on your modified loan will be adjusted as noted in the attached Modification Agreement in Section 3.C.

**DEFERRAL OF PRINCIPAL.** To further reduce your mortgage payment, we will defer collection of and not collect interest on $30,800.00 of your outstanding principal. You will not be required to make monthly payments on that portion. This portion of principal will be due when you pay off the modified loan, which will be when you sell or transfer an interest in your house, refinance the loan, or when the last scheduled payment is due.

**PRINCIPAL REDUCTION ALTERNATIVE.** You may be eligible to have some of your principal forgiven on a deferred basis. If you make your monthly mortgage payments on time, we will forgive $40,148.59 of the principal balance of your loan each year on the anniversary of your first trial period payment date for three years. You will lose this benefit if your modified loan loses good standing, which means that the equivalent of three full monthly payments are due and unpaid on the last day of any month, at any time during this three year period, including all accrued and unapplied amounts, even if the mortgage loan is later brought current. Any principal forgiveness will be reported to the Internal Revenue Service and may have tax consequences. You are advised to seek guidance from a tax professional. Please contact us at (800) 848-9380 if you do not want principal forgiveness, we may have other modification options for you.

**ESCROW ACCOUNT.** The terms of your Modification Agreement require the servicer to set aside a portion of your new monthly payment in an escrow account for payment of your property taxes, insurance premiums and other required fees. Any prior waiver of escrows by your lender is no longer in effect. JPMORGAN CHASE BANK, N.A. will draw on this account to pay your real estate taxes and insurance premiums as they come due. Please note that your escrow payment amount will adjust if your taxes, insurance premiums and/or assessment amounts change, so the amount of your monthly payment that JPMORGAN CHASE BANK, N.A. must place in escrow will also adjust as permitted by law. This means that your monthly payment may change. Your initial monthly escrow payment will be $789.08. This amount is included in the loan payment noted in Section 3.C. of the enclosed Modification Agreement; you do not need to remit this amount separately.

**ESCROW SHORTAGE.** Due to the timing of your tax and insurance payments, we have determined that there is a shortage of funds in your escrow account in the amount of $2,958.94. You may pay this amount over a 5-year (60 months) period. This monthly payment has already been included in the monthly escrow payment stated above. If you wish to pay the total shortage now in a lump sum, please contact us. Paying this amount now in a lump sum will reduce your new monthly mortgage payment.

**PAYMENT SCHEDULE.** The enclosed Modification Agreement includes a payment schedule in Section 3.C. showing your payment plan for the life of your modified loan after the trial period.

**FEES.** There are no fees or other charges for this modification.

**REPRESENTATIONS.** Please read the enclosed Modification Agreement carefully and make sure that you understand it and that the statements set forth in the "My Representations" section are true and accurate. If you have any questions, please contact us at **(800) 848-9380**.

OP359 V11 09-06-11



## – IMPORTANT –
### TO ENSURE YOUR DOCUMENTS ARE COMPLETED TIMELY AND ACCURATELY, PLEASE FOLLOW ALL THE SIGNING INSTRUCTIONS BELOW.

You have been provided with two original document packages. Both sets of documents must be signed in the presence of a notary and returned via the pre-paid Federal Express envelope provided. Please call FEDEX at 1-800-463-3339 or take your documents to the nearest FEDEX drop box.

DO NOT deface the document with ANY changes or markings. Example(s): Liquid and/or tape white out is not allowed. Adjustments to pre-printed name(s) such as spelling or corrections to initials is not allowed. Any alterations to the documents could cause the documents to be invalid.

### NOTARY PUBLIC:
All signatures must occur in the presence of a certified notary public. Your local bank, attorney or title company should be able to assist you with certified notary public services.

The notary public must:
- Legibly affix stamp or seal identifying him or her as a certified notary on the same date of all required signature(s).
- The notary seal or stamp should be placed within the margins of the document. Any seal or stamp that is not placed accordingly could cause the document to be invalid.
- There can be no alteration to the notary stamp or seal other than adding their expiration date when not present.
- District of Columbia: Borrower(s) and notary public must sign the FP 7/C tax form. Additionally borrowers and Notary Public must sign the Affidavit Addendum.

### BORROWER(S) SIGNATURES:
Review the signature page and make note of all parties required to sign as indicated below:
- Only those borrower(s) name(s) that are pre-printed on the signature page should sign the document where the pre-printed name is indicated. Please make sure to date the document on the appropriate line.
- Signature(s) must be exactly as they appear under the signature(s) line. Do not make name adjustments such as spelling or corrections to initials.

Example: If the text below the signature line reads "John W. Doe," the signature must be "John W. Doe" not "John Doe" or "JW Doe." Or if it reads "John W. Doe by Jane Doe as attorney in fact," the signature must be "John W. Doe by Jane Doe as attorney in fact."

### LENDERS ACKNOWLEDGEMENT:
The lender's acknowledgement page will be completed by JPMORGAN CHASE BANK, N.A..

### WITNESS SIGNATURE(S):
If your document has lines for witness signatures, you must have two witnesses sign and legibly print their names, below their signatures where indicated. Witnesses must sign in the presence of a notary as described within the Notary Public section above. You, the borrower on the note, cannot sign as a witness. A Notary Public cannot sign as a witness in: GA, LA, or SC.

### AFFIDAVIT:
Borrower(s) must sign the enclosed affidavit as required by Prince George County, Maryland and the District of Columbia. Signature should be completed as described above under "Borrower(s) Signature(s)."



V050610

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

*Rowland v. JPMorgan Chase Bank, N.A., et al.*
Alameda Superior Court Case No.  RG 13 705690
USDC - Northern District of California Case No.

 I am employed in the County of San Francisco, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is **AlvaradoSmith, 235 Pine Street, Suite 1200, San Francisco, California 94104**.

 On January 3, 2014, I served the foregoing document described as **NOTICE OF REMOVAL** on the interested parties in this action.

☐ by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

**SEE ATTACHED SERVICE LIST**

☒ **BY REGULAR MAIL:** I deposited such envelope in the mail at 235 Pine Street, Suite 1200, San Francisco, CA 94104.  The envelope was mailed with postage thereon fully prepaid.

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

**BY THE ACT OF FILING OR SERVICE, THAT THE DOCUMENT WAS PRODUCED ON PAPER PURCHASED AS RECYCLED**

☐ **BY FACSIMILE MACHINE:**  I Tele-Faxed a copy of the original document to the above facsimile numbers.

☐ **BY OVERNIGHT MAIL:**  I deposited such documents at the Overnite Express or Federal Express Drop Box located at 235 Pine Street, San Francisco, CA 94104.  The envelope was deposited with delivery fees thereon fully prepaid.

☐ **BY PERSONAL SERVICE:**  I caused such envelope(s) to be delivered by hand to the above addressee(s).

☐ (State)  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☒ (Federal)  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on January 3, 2014, at San Francisco, California.

_Mara J. Schwark_
Mara J. Schwark

ALVARADOSMITH
A PROFESSIONAL CORPORATION
SAN FRANCISCO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**

Rowland v. JPMorgan Chase Bank, N.A., et al.
**USDC - Northern District of California Case No.**

| | |
|---|---|
| Maeve Elise Brown | Attorneys for Plaintiffs |
| Elizabeth S. Letcher | |
| Cynthia Singerman | Tel:  (510) 271-8443 |
| HOUSING AND ECONOMIC | |
| RIGHTS ADVOCATES | E-Mail:  eletcher@heraca.org |
| 1814 Franklin Street, Suite 1040 | |
| Oakland, CA  94612 | |
| | |
| William E. Kennedy | Attorneys for Plaintiffs |
| CONSUMER LAW OFFICE OF | |
| WILLIAM E. KENNEDY | Tel:  (408) 241-1000 |
| 2797 Park Avenue, Suite 201 | |
| Santa Clara, CA  95050 | E-Mail:  wkennedv@kennedvconsumerlaw.com |

ALVARADOSMITH
A PROFESSIONAL CORPORATION
SAN FRANCISCO