UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| TERESA ROWLAND , BRIAN ROWLAND,<br><br>                Plaintiffs,<br>        v.<br><br>JPMORGAN CHASE BANK, N.A., SELECT PORTFOLIO SERVICING, INC., AND U.S. BANK, N.A., SUCCESSOR TRUSTEE TO BANK OF AMERICA, N.A., SUCCESSOR IN INTEREST TO LASALLE BANK, N.A. AS TRUSTEE, ON BEHALF OF THE WASHINGTON MUTUAL MORTGAGE PASS-THROUGH CERTIFICATES WMALT Series 2006-AR9, and DOES 1 through 100, inclusive,<br><br>                Defendants.<br>_____/ | No. C 14-00036 LB<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**<br><br>[Re: ECF No. 5] |

**INTRODUCTION**

Plaintiffs Teresa and Brian Rowland sued JPMorgan Chase Bank, Select Portfolio Servicing, and U.S. Bank, alleging state contract and tort claims arising out of the handling of Plaintiffs' loan modification. *See* Complaint, ECF No. 1 at 5.[1] Chase and U.S. Bank moved to dismiss Plaintiffs' claims for promissory estoppel, negligence, and intrusion upon seclusion. *See* Motion, ECF No. 5. Pursuant to Civil Local Rule 7-1(b), the court finds this matter suitable for determination without

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document.

C 14-00036 LB
ORDER

oral argument and **DENIES** the motion to dismiss.

## STATEMENT

### I. THE PARTIES AND PLAINTIFFS' LOANS

Plaintiffs Teresa Rowland and Brian Rowland are residents of Alameda County, California. Complaint, ECF No. 1, ¶¶ 4-5. In 2006, Plaintiffs purchased a home located at 459 Washburn Drive in Fremont, California for $810,000, using a $648,000 negatively amortizing mortgage loan to Teresa Rowland, and they paid the remainder in cash. *Id.* ¶¶ 13-14. The loan provided for a 40-year term and an interest rate of 7.75 percent that would change monthly according to an index, but locked the Plaintiffs into a "teaser" rate of only one percent for the first year, adding the additional 6.75 percent the unpaid balance. *Id.* ¶ 14. The loan provided for several payment options for subsequent years, including negatively amortizing options which would disappear only when the loan balance rose to $712,800. *Id.*; *see* Compl. Ex. A (Loan Note and Deed of Trust).

In 2008, Ms. Rowland's income dropped, Mr. Rowland's employer did not give him a promised salary increase, and the payments on their negatively amortizing mortgage increased. *Id.* ¶ 15. Plaintiffs contacted their mortgage servicer, then Washington Mutual, and applied for a modification in 2009. *Id.* Plaintiffs entered into a trial modification under the federal Home Affordable Modification Program ("HAMP") with Chase in April 2011 and made three timely trial. Payments as requested. *Id.*

In October 2011, the Rowlands received a Home Affordable Modification Agreement. The loan modification was to be effective December 1, 2011, with a total principal balance of $819,645.76, of which $151,245.76 would not bear interest. *Id.* ¶ 16. In addition, $120,445.76 of the deferred principal would be eligible for forgiveness over the course of three years and the total interest-bearing principal would be $668,400. For the first five years, the interest rate was two percent and would gradually step up to four percent in 2017. *Id.* Initially, the principal and interest payment was $2,024.09 and the estimated payment, including escrow, was $2,813.17. *Id.* Because the loan was amortized over 40 years but had a term of only 34 years, it had a balloon payment of $181,648.14. *Id.*; *see* Compl. Ex. B (12/2011 HAMP modification agreement). Teresa Rowland signed and returned the first HAMP Modification and timely paid the first two payments for

December 2011 and January 2012. Complaint ¶ 17.

In January 2012, Chase sent Ms. Rowland a second HAMP loan modification agreement to sign. Ms. Rowland called Lindsey Bull, the Chase representative assigned to her loan, for an explanation. Ms. Bull said that there was a very small error in the first set of documents, that the modification was complete, and that Ms. Rowland should continue making payments. *Id.* ¶ 18.

The new agreement, however, was less favorable. It added about $4,000 to the non-interest-bearing loan balance, which made the new principal balance $823,727.32. The interest-bearing principal amount was the same, and the monthly payment amounts were the same for the first seven years. Starting in 2018, however, the loan would become fixed at 4.75 percent rather than four percent, a difference of about $200 per month for 26 years. *Id.* ¶ 19. The Rowlands signed and returned the new agreement despite the less favorable terms because they were so exhausted by the two years of trying to get a modification and pleased to have it behind them. *Id.* ¶ 20.

Since December 2011, plaintiffs have continued to make timely payment of $2,817.13 and have never missed a monthly payment. *Id.* ¶ 21. Ms. Bull told Teresa Rowland that it could take up to three or four months to finalize the modification and that plaintiffs would receive a completed, recorded copy when it was finalized. *Id.* ¶ 22.

In March 2012, plaintiffs receive a mortgage statement that requested a higher payment. *Id.* ¶ 23. Ms. Rowland also received a collection call from a "Peter" at Chase, who asked her why she was not making her loan payments and who seems to know nothing about the modification. *Id.* The same day, Ms. Rowland spoke to Ms. Bull, who told her to disregard the statement and that the modification was in place and in the process of being finalized. *Id.*

By the summer of 2012, the Rowlands started getting repeated collection calls from Chase, stating that they were behind on their mortgage. Ms. Rowland would explain that they had entered into a permanent loan modification, and the collection representatives would say they did not see a modification and were in a different department. *Id.* ¶ 24. The Rowlands did not answer many of these collection calls because they recognized the incoming number, and their previous attempts to explain the existence of the modification to Chase personnel had been futile. *Id.* Ms. Rowland called to check on the status of the modification throughout the summer of 2012, and each time,

1  Chase representatives assured her the modification was being finalized.

2      On September 7, 2012, the Rowlands received a certified letter from Chase stating that they were
3  in default and that $139,627.31 was past due on the mortgage. *Id.* ¶ 26.  Chase's collection efforts
4  and delinquency notices, which ranged "from statements to letters to even intrusive, upsetting home
5  visits" caused the Rowlands to suffer extreme stress and anxiety. *Id.* ¶ 27.

6      From September 2012 on, Ms. Rowland repeatedly wrote Chase, describing the emotional
7  distress caused by the collection calls, mortgage statements, and default letters, and she asked Chase
8  to stop, finalize the loan, update its systems, and give her accurate information that the loan
9  modification was in place. *Id.* ¶¶ 28, 33 (alleging Ms. Rowland sent letters on September 15,
10 December 3, and December 17, 2012).

11     Ms. Rowland received a letter from Chase, dated October 9, 2012, that stated that Chase had
12 been unable to contact Ms. Rowland to consider her for a loan modification and that the Rowlands'
13 account was $142,215.20 in arrears. *Id.* ¶ 35.

14     On or about October 26, 2012, a Chase representative told Ms. Rowland that the modification
15 documents "should be finalized and ready" by November 14, 2012. *Id.* ¶ 29.  On November 30,
16 2012, a Chase representative called Ms. Rowland, asked why she had not made a payment in 36
17 months, and accused her of not responding to Chase and not caring about her loan obligations,
18 which made Ms. Rowland feel as though her home was in jeopardy. *Id.* ¶ 30.  When Ms. Rowland
19 explained that she had been granted a modification the year before, he denied that the modification
20 existed, saying he could not see it in the system and "If we [Chase] don't sign the modification
21 documents, then the loan modification doesn't exist." *Id.*  Ms. Rowland ultimately spoke to a
22 supervisor named "Sergio," who said he would do research and call back within five business days.
23 *Id.*  "Sergio" never called back.  This call, which came right before the Rowlands' annual extended
24 family Christmas gathering weekend, all but ruined the holiday gathering for Ms. Rowland. *Id.*

25     On December 3, 2012 Ms. Rowland wrote to Chase again. *Id.* ¶ 31.  She described these
26 interactions and begged Chase to finalize the modification and stop the collection calls demanding
27 payments that were not due. *Id.*

28     Chase continue to send collection letters, stating, for example, that the Rowlands were "at risk of

C 14-00036 LB
ORDER                   4

losing their home" and "it might be time to sell your home in order to stop collection calls, avoid foreclosure, find financial peace of mind and make a fresh start[."] *Id.* ¶ 32. The communications, coupled with the uncertainty, caused the Rowlands immense distress and anxiety. *Id.*

In January 2013, Chase representative John Baylog called Ms. Rowland, said that he was assigned to respond to her most recent letter, and said that he had spent several hours researching why her modification was delayed. *Id.* ¶ 34. He stated that the loan was "with escrow" and was "awaiting management approval." *Id.* Ms. Rowland was shocked because she had been told for well over a year that the loan modification had been approved and was in place. *Id.*

Still, the Rowlands continued to receive letters from Chase titled "Notice of Intent to Foreclose," or stating that the property might be referred to foreclosure. *Id.* ¶ 35. At least three of these letters (dated November 5, 2012, December 11, 2012, and February 28, 2013), said: "You have stated that you are not interested in pursuing an available loan modification or you have not accepted our loan modification offer." *Id.*

In March 2013, Ms. Rowland received a letter stating that her loan modification and escrow account had been terminated. *Id.* ¶ 35. She wrote Chase again on March 14, 2013, describing the physical and emotional toll that the uncertainty and fear were taking on her and her family. *Id.* Throughout March and April 2013, Chase representatives told the Rowlands the modification was bouncing back and forth between a "remediation team" and the underwriting and closing departments. *Id.* ¶ 36.

Ms. Rowland received a third set of loan modification documents on May 13, 2013. *Id.* ¶ 37. This permanent HAMP modification had terms that were much less favorable. *Id.* The modification was to take effect on July 1, 2013, giving the Rowlands no credit for nearly 2 years of timely payments. The unpaid principal balance would be $823,792.17. The agreement did not mention any principal forgiveness although $142,400 of the principal would be non-interest-bearing. The interest rate would began at 2 percent and step up to 4.75 percent in 2020. Finally, although the maturity date remained the same, the balloon payment increased by over $170,000 to $351,573.42. *Id.*

Over the next several months, Chase representatives admitted that the third modification had mistakenly omitted principal reduction. *Id.* ¶ 38. The Chase representatives repeatedly called to

C 14-00036 LB
ORDER                                                   5

"follow up" but had no information to share about the status of the loan. Every several weeks, Ms. Rowland wrote Chase to request that the modification be completed. She ultimately asked Chase to stop calling unless it had new information to offer because the calls were so frustrating. *Id.*

Chase sent a fourth set of modification documents dated July 10, 2013 that more or less mirrored the original loan modification terms. *Id.* ¶ 39. The agreement changed the interest rate retroactively to December 1, 2011, deferred $145,728.69 of the unpaid principal balance, made $114,928.69 of that balance elegible for forgiveness, and set the balloon payment amount at $181,648.14. *Id.* Ms. Rowland signed and returned the agreement on or about July 22, 2013.

In an August 6, 2013 letter to Ms. Rowland, Chase summarized its errors as follows:

> Rowland:
>
> Our records show that we initially approve your loan for a Home Affordable Modification Program (HAMP) trial period on February 16, 2011, with three monthly payments of $2,813.17 each due on April 1, 2011, May 1, 2011, and June 1, 2011. You successfully completed the trial period plan, and your file was submitted to underwriting to be reviewed for a permanent loan modification in June 2011.
>
> A permanent HAMP modification was approved on August 8, 2011, which you signed and returned [to] our office, but the documents could not be approved due to a calculation error in the escrow portion of the documents. The file was reworked, and new documents were sent to you on October 18, 2011, which you signed and returned on October 27, 2011. However, a review of the documents again showed that we had inadvertently calculated your escrow incorrectly, and the modification could not be finalized.
>
> A new set of HAMP documents were generated, and these updated documents were sent to you on January 19, 2012, and again on January 24, 2012. You signed the documents and return them to our office on February 8 2012; however the loan modification could again not be executed due to errors on the documents. Our notes stated that discrepancies were found in calculations regarding the escrow shortage, the unpaid principal balance and the current due date listed in the documents.
>
> The file remained in remediation throughout 2012 as we attempted to correct the errors in the documents, and the calculation errors in the documents were not corrected until a new copy of the documents was mailed to you on May 10, 2013.
>
> Upon receipt of the documents, you disputed the terms being offered to you, and our review of the documents confirmed that we had not offered you the correct terms. We sent the documents again for a remediation review to correct the errors, and the review was completed on July 10, 2013, at which time a corrected version of the final modification documents were sent to you.

*Id.* ¶ 40.

Starting August 1, 2013, servicing of the Rowlands' loan was transferred from Chase to SPS. *Id.* ¶ 41. The Rowlands received correspondence from SPS that did not mention the loan modification.

C 14-00036 LB
ORDER                                                6

*Id.* ¶ 42. For example, SPS sent a letter dated August 20, 2013 that discussed a rate change under the old, negatively amortizing loan terms, and a statement indicated a $2,585.09 charge for "FC Costs," which Plaintiffs believe to be foreclosure costs charged to the loan acount. *Id.* On August 26, 2013, Ms. Rowland sent a written complaint to SPS, describing the ongoing servicing error and demanding that SPS honor the loan modification, strip the unlawful fees, and ensure that the Rowlands received the principal reductions and HAMP incentives to which they were entitled. *Id.* ¶ 43.

SPS indicated that it intends to honor the loan modification and implement it by the end of October. *Id.* ¶ 44. Instead, SPS sent multiple accounts notices based on the pre-modification terms and a letter encouraging the Rowlands to apply for "foreclosure alternatives," such as a short sale or deed in lieu of foreclosure. *Id.* On October 10, 2013, an SPS representative indicated that the account was paid only through February 2012. *Id.* As of December 5, 2013 (when the Rowlands filed their state court complaint), SPS had not implemented the loan modification. *Id.* at 1, ¶ 44.

Plaintiffs claim that (1) Defendants' conduct caused them substantial damages, including monetary damages related to "misapplied credit," inaccurate interest charges, and unwarranted foreclosure and other fees, (2) their loan balance has not been reduced, and (3) they have not received the $2,000 "incentive credits" they are owed for making timely payments under the HAMP program. *Id.* They also have suffered a range of physical, emotional, and psychological symptoms as a result of Defendants' conduct. *See id.* ¶ 46.

## IV. PROCEDURAL HISTORY

Plaintiffs filed their lawsuit on December 5, 2013 in state court. *See id.* at 1. Their complaint contains the following claims: (1) breach of contract (modification agreement) (Ms. Rowland against all Defendants); (2) promissory estoppel (Mr. and Ms. Rowland against Chase and U.S. Bank); (3) violation of the Real Estate Settlement and Procedures Act (RESPA), 12 U.S.C. §§ 2601, *et seq.* (Ms. Rowland against Chase and SPS); (4) negligence (Mr. and Ms. Rowland against Chase); (5) intrusion upon seclusion (Mr. and Ms. Rowland against Chase); (6) violation of California Consumer Credit Reporting Act, Cal. Civ. Code § 1785.1 *et seq.* (Ms. Rowland against Chase); (7) violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, *et seq.* (Ms.

Rowland against Chase); (8) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* (Mr. and Ms. Rowland against all Defendants). *See id.* ¶¶ 48-107.

Plaintiffs served Chase on December 13, 2013, and Chase removed the case to this court on January 3, 2014, invoking federal question jurisdiction. *See* Notice of Removal, ECF No. 1, ¶¶ 2-3. Chase stated that it had not yet received consent to remove from U.S. Bank or SPS. *Id.* ¶ 4. On January 27 2014, Chase and U.S. Bank filed the motion to dismiss the claims for promissory estoppel, negligence, and intrusion upon seclusion. *See* Motion to Dismiss, ECF No. 5. SPS answered the complaint on February 21, 2014. See ECF No. 14. All parties consented to the undersigned's jurisdiction. See ECF Nos. 6 (Chase and U.S. Bank), 9 (Plaintiffs), & 15 (SPS).

## ANALYSIS

### I. LEGAL STANDARD

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557.). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

### II. DISCUSSION

Chase and U.S. Bank move to dismiss Plaintiffs' claims for promissory estoppel, negligence, and

invasion of privacy (intrusion upon seclusion).

**A. Promissory Estoppel**

Defendants argue that the Rowlands may not proceed with claims for both promissory estoppel and breach of contract based on essentially identical allegations.[2] *See* Motion at 5. Because the validity and terms of the contract may be disputed, Plaintiffs may plead their claims in the alternative and the court denies the motion to dismiss this claim.

Under California law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *See Kajima/Ray Wilson v. Los Angeles Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000). Promissory estoppel is an equitable doctrine whose remedy may be limited "as justice so requires." *See id.* Where equity requires, promissory estoppel is invoked "to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced." *Kajima/Ray Wilson v. Los Angeles Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (Cal. 2000). The elements of promissory estoppel are: "(1) a clear promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; (3) injury (meaning, substantial detriment); and (4) damages 'measured by the extent of the obligation assumed and not performed.'" *See Errico v. Pacific Capital Bank, N.A.*, 753 F. Supp. 2d 1034, 1048 (N.D. Cal. 2010) (citing and quoting *Poway Royal Mobilehome Owners Ass'n. v. City of Poway*, 149 Cal. App. 4th 1460, 1470 (2007)).

Plaintiffs' claim for promissory estoppel is that Defendants promised to "modify the loan, change its terms, except modified payment in full" and that this is demonstrated by the "Modification Agreement," and Chase's statements that Plaintiffs should continue payments. Compl. ¶¶ 55-59. The Rowlands allege that they relied on Defendants' promises "by making loan payments in the amount demanded and by refraining from taking alternative measures to save their home," and that the reliance on these written and oral promises was reasonable and foreseeable. *Id.* ¶¶ 57-58. Finally, they allege that they were substantially injured by relying on the Modification

---

[2] Both Mr. and Ms. Rowland allege claims for promissory estoppel, but only Ms. Rowland alleges a claim for breach of contract. *Compare* Complaint ¶¶ 48-54, with ¶¶ 55-59.

Agreement and the oral confirmation of that agreement because their reliance caused (1) the imposition of fees in arrears that have increased the unpaid balance of the loan, (2) missed reduction in the principal amount of the loan, and (3) emotional distress. *Id.* ¶ 59. Ms. Rowland's breach of contract claim is based on allegations that a contract was formed when "Plaintiff accepted Chase's written offer to modify by signing and notarizing the October 2011 Modification Agreement and returning it to Chase," that Ms. Rowland performed her obligations under the contract, and that Chase breached it by failing to implement the contract. *Id.* ¶¶ 49-54.

Defendants argue that the Rowlands' promissory estoppel claim fails because it is based on "essentially identical" allegations to their breach of contract claim. Motion at 5. "If the parties entered into a contract as [P]laintiffs allege, then relief for promissory estoppel is unavailable." Reply at 2. The court disagrees.

The Federal Rules of Civil Procedure and the applicable case law uniformly permit promissory estoppel and breach of contract claims to be pleaded in the alternative where there may be a dispute about the terms or validity of the alleged contract. Federal Rule of Civil Procedure 8(d)(2)-(3) expressly permits a party to plead alternative and even inconsistent claims:

> **(2)** *Alternative Statements of a Claim or Defense.* A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
>
> **(3)** *Inconsistent Claims or Defenses.* A party may state as many separate claims or defenses as it has, regardless of consistency.

The case law is consistent. For example in *Wigod v. Wells Fargo*, the Seventh Circuit reversed the dismissal of a promissory estoppel claim and explained:

> One or more of Wells Fargo's contract defenses may remain in dispute for the remainder of the litigation. For this reason, Wigod may preserve her promissory estoppel claim as an alternative in the event the district court or a jury later concludes as a factual matter that an enforceable contract did not exist.

673 F.3d 547, 566 & n.8 (7th Cir. 2012). Case law in this circuit and district is in accord with *Wigod*. *See, e.g., Putnam v. Putnam Lovell Grp. NBF Secuirites, Inc.*, No. C 05-1330 CW, 2006 WL 1821207 (N.D. Cal. June 30, 2006) (denying motion to dismiss breach of implied contract and promissory estoppel claims pleaded in the alternative because "plaintiffs are allowed to plead

mutually exclusive claims in the alternative, but are not allowed to 'recover on inconsistent theories'") (quoting *Mike Nelson Co. v. Hathaway*, No. F 05-0208 (AWAI), 2005 WL 2179310, at *4 (E.D. Cal. Sept. 8, 2005)); *Trunov v. Rusanoff*, No. 12-CV-04149 NC, 2012 WL 6115608 (N.D. Cal. Dec. 10, 2012) (denying motion to dismiss promissory estoppel counterclaim pleaded in the alternative to a breach of contract counterclaim because pleading in the alternative was permissible).

In their reply, Defendants do not distinguish *Wigod* directly and instead cite *Lazo v. Bank of America, N.A.*, which is a case that distinguished *Wigod*. *See* No. C 12-00762 LB, 2012 WL 1831577 (May 18, 2012). *Lazo* involved a challenge to the sufficiency of the plaintiff's promissory estoppel allegations. The court explained that in *Wigod,* the plaintiff's promissory estoppel claim was sufficiently pleaded because the HAMP guidelines filled in undefined contractual terms. *See id.* at *5. That analysis says nothing about the issue here, which is whether the Rowlands may plead breach of contract and promissory estoppel claims in the alternative.[3]

Defendants also quote *JMP Securities LLP v. Altair Nanotechnologies Inc.*, for the proposition that "[u]nder California law, the same allegations that give rise to a breach of contract claim cannot also give rise to a claim for promissory estoppel, as the former is predicated on a promise involving bargained-for consideration, while the latter is predicated on a promise predicated on reliance in lieu of such consideration." 880 F. Supp. 2d 1029, 1041 (N.D. Cal. 2012); *see* Motion at 5. But in *JMP Securities*, the parties agreed that there was a written contract that was supported by consideration. 880 F. Supp. 2d at 1041-42. Promissory estoppel, therefore, did not apply because "[t]he purpose of the doctrine of promissory estoppel is to permit a court of equity to excuse the absence of consideration for an otherwise enforceable promise." *Id.* Here, because Defendants may still challenge the Rowlands' breach of contract claim, their promissory estoppel claim can remain. Accordingly, the court denies Defendants' motion to dismiss the promissory estoppel claim.

**B. Plaintiffs' Negligence Claim – Duty**

---

[3] Defendants cite other cases that discuss the circumstances in which a trial modification agreement may constitute an enforceable contract, but those are irrelevant to the alternative pleading issue here. *See* Reply at 3 (citing *Sholiay v. Fed. Nat. Mortgage Ass'n*, No. CIV. 2:13-00958 WBS, 2013 WL 3773896 (E.D. Cal. July 17, 2013); *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 796-98 (2013)).

C 14-00036 LB
ORDER                                                11

Defendants next move to dismiss Plaintiffs' fourth claim for negligence. *See* Motion, ECF No. 5 at 6; Complaint, ECF No. 1, ¶¶ 69-77. The elements of a negligence cause of action are (1) the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4) damages. *See Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 500 (2001). Under California law, as Defendants point out, lenders generally do not owe borrowers a duty of care unless their involvement in the loan transaction exceeds the scope of their "conventional role as a mere lender of money." *See Nymark v. Heart Fed. Savings & Loan Ass'n*, 231 Cal. App. 3d 1089, 1095-96 (1991) (citations omitted). To determine "whether a financial institution owes a duty of care to a borrower-client," courts must balance the following non-exhaustive factors:

> [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

*Id.* at 1098 (quotation marks and citations omitted).[4]

Defendants argue that Chase was under no duty to provide a loan modification because it did not exceed the scope of its conventional role as a mere lender of money. Motion at 6-7. Defendants counter that numerous California federal and state courts have applied the six-factor test articulated in *Nymark* "to find mortgage servicers have a duty, including this Court." Opp'n at 14-15 (citing *Chancellor v. OneWest Bank*, No. C 12-01068 LB, 2012 WL 1868750, at *13 (N.D. Cal. May 22, 2012)). Indeed, as the state and federal district court cases cited by the parties demonstrate, courts are divided on the question of when lenders owe a duty of care to borrowers in the context of the submission of and negotiations related to loan modification applications and foreclosure proceedings.[5] *Compare* Motion, ECF No. 5 at 6-7 and Reply, ECF No. 13 at 3-4 (*citing Diunugala v.*

---

[4] The parties and some cases also refer to these as the "*Biakanja* factors" after *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

[5] In its motion and reply brief, Defendants cite *Aspiras v. Wells Fargo Bank, N.A.*, 162 Cal. Rptr. 3d 230 (Cal. Ct. App. 2013). While that opinion previously had been published in the Official Appellate Reports, *see* 219 Cal. App. 4th 948, the California Supreme Court ordered the opinion depublished on January 15, 2014, *see* 2014 Cal. LEXIS 399, which means the opinion is not to be cited after that date (except under limited circumstances not present here), *see* Cal. Rules of Ct.

C 14-00036 LB
ORDER                                    12

*JP Morgan Chase Bank, N.A.*, No. 12cv2106-WQH-NLS, 2013 WL 5568737, at *4 (S.D. Cal. Oct. 3, 2013) (finding *Jolley* (cited by the Rowlands) inapposite in the context of "a residential home loan and related loan servicing issues" and granting motion to dismiss negligence claim against lender and servicer that used wrong underwriting standards when reviewing loan modification application); *Rockridge Trust v. Wells Fargo, N.A.*, No. C-13-01457 JCS, 2013 WL 5428722, at *35-36 (N.D. Cal. Sept. 25, 2013) (noting divergent opinions, collecting cases, and holding that loan modification is a traditional money lending activity that does not give rise to a duty of care); *Sanguinetti v. CitiMortgage, Inc.*, No. C 12-5424 SC, 2013 WL 4838765, at *4-5 (N.D. Cal. Sept. 11, 2013) (dismissing negligence claim based on lender's duty of care to follow proper loan modification procedures where alleged duty arose from consent judgment between lender and California and federal governments regarding mortgage practices); *Hosseini v. Wells Fargo Bank, N.A.*, No. C-13-02066 DMR, 2013 WL 4279632, at *7 (N.D. Cal. Aug. 9, 2013) (dismissing negligence claim for failure to establish duty of care based on lender's "undertaking the loan modificiation process and requesting and accepting documentation" from plaintiffs)*; Armstrong v. Chevy Chase Bank, FSB*, No. 5:11-cv-05664 EJD, 2012 WL 4747165, at *4 (N.D. Cal. Oct. 3, 2012) (loan modification is a traditional money lending activity); *Nymark*, 231 Cal. App. 3d at 1096-97 (court found that a lender owed the plaintiff no duty because the lender performed an appraisal of the plaintiff's property "in the usual course and scope of its loan processing procedures to protect [the lender's] interest by satisfying [itself] that the property provided adequate security for the loan")*;* and *Wagner v. Benson*, 101 Cal. App. 3d 27, 35 (Cal. Ct. App. 1980) (court rejected the plaintiffs' negligence claim that was based on their allegation that the lender was negligent "in loaning money to them, as inexperienced

---

8.1115(a) & (b). *See also* Cal. Rules of Ct. 8.1105, 8.1110, 8.1115, 8.1120 & 8.1125 (providing the rules for the publication and depublication of opinions and when those opinions may be cited). The court notes that Defendants filed their motion on January 27, 2014 – nearly two weeks after *Aspiras* was depublished – meaning that Defendants never should have cited it. There is a red "flag" attached to the opinion on Westlaw and a red "stop sign" attached to it on Lexis, and there are clear notations in both databases that the opinion had been depublished. Defendants also cite *Aspiras* in their reply brief, which was filed over a month after *Aspiras* was depublished, and after the Rowlands pointed out the depublication out in their opposition. *See* Reply, ECF No. 13 at 3; Opp'n at 13 & n.2.

investors, for a risky venture over which the [lender] exercised influence and control")); *with* Opp'n, ECF No. 11 at 14-15 (citing *McGarvey v. JP Morgan Chase Bank, N.A.*, No. 2:13-cv-01099-KJM-EFB, 2013 WL 5597148, at *6 (E.D Cal. October 11, 2013) (denying motion to dismiss because, once it offered a loan modification and processed her application, servicer could have duty of care to deceased borrower's daughter to exercise ordinary care in processing loan modification request); *Jolley v. Chase Home Finance, LLC*, 213 Cal. App. 4th 872 (2013) (holding that there was a triable issue of material fact as to whether Chase owed Jolley a duty of care in servicing a construction loan, which was disbursed in installments depending on progress towards completion); *Trant v. Wells Fargo Bank, N.A.*, No. 12-cv-164-JM-WMC, 2012 WL 2871642, at *6-7 (S.D. Cal. July 12, 2012) (finding duty of care because lender acted outside the scope of the typical lender-borrower relationship where employees ensured plaintiffs they would receive at least a temporary modification); *Kennedy v. Wells Fargo Bank, N.A.*, No. No. CV 11-4635 DSF (PLAx), 2011 WL 4526085, at *4 (C.D. Cal. Sept. 28, 2011) (applying the six-factor test and finding that the totality of the circumstances favored finding a duty of care at the motion to dismiss stage); *Ansanelli v. JP Morgan Chase Bank, N.A.*, No. C 10-03892 WHA, 2011 WL 1134451, at *7 (N.D. Cal. Mar. 28, 2011) (finding sufficient active participation by the servicer to create a duty where the defendant offered "an opportunity to plaintiffs for loan modification and to engage with them concerning the trial period plan," which was "precisely 'beyond the domain of a usual money lender'"); *Garcia v. Ocwen Loan Servicing, LLC*, No. C 10-0290 PVT, 2010 WL 1881098 (N.D. Cal. May 10, 2010) (finding that a servicer had a duty of care to a borrower under the *Nymark* factors).

In light of the divergent case law, the undersigned recently issued an opinion weighing the lines of authority. *See Rijhwani v. Wells Fargo Home Mortgage, Inc.*, No. C 13-05881 LB, 2014 WL 8900016, at *14-17 (N.D. Cal. Mar. 3, 2014). The court found (and reaffirms here) that *Garcia* is persuasive and instructive. As the court explained, in *Garcia*:

> the defendant had [at least twice] cancelled the trustee's sale to allow time for processing the plaintiff's application. The defendant asked the plaintiff to submit various documents in connection with the loan modification request. The plaintiff did so, but upon receiving the documents, the defendant routed them to the wrong department. Later, the plaintiff's agent received a recorded message indicating documents were missing, but the message did not identify which ones were missing. For the next several weeks, the plaintiff's agent repeatedly tried to contact the defendant to determine which documents were missing, but he was unable to speak with any of the defendant's employees. The plaintiff's agent was finally

> able to actually speak with one of the defendant's employees, but it was too late. The employee informed the plaintiff's agent that the home had been sold at a trustee's sale the day before.
>
> The court concluded that at least five of the six factors cited above weighed in favor of finding that the defendant owed the plaintiff a duty of care in processing the plaintiff's loan modification application. *Id*. at *3-4.

*Id.* at *16-17. Similarly, in *Rijhwani*, the court found that the *Nymark* factors supported finding a duty of care and denied the motion to dismiss the plaintiff's negligence claim. *Id.* at *17.

The court reaches the same conclusion on the factors here.[6] First, the loan modification was intended to affect the Rowlands because it would have reduced their mortgage payments. The Rowlands' allegations are stronger than those in many of the cases finding a duty of care because (at least as alleged) Chase did not just mishandle a loan modification application. Instead, it mishandled an approved loan modification agreement that Chase representatives repeatedly stated was "complete" and "in place." *See, e.g.,* Complaint ¶¶ 15-18, 23. Second, the harm in mishandling a loan modification agreement is foreseeable from the outset (and Chase's alleged breaches continued even while Ms. Rowland reported the ongoing emotional distress from Chase's delays and collection efforts). Third, the injury was certain to occur in that the principal balance would not be reduced, penalties would accrue, and Ms. Rowland reported the ongoing emotional distress. Fourth, the connection between Chase's alleged conduct and the injury is obviously direct and immediate. Fifth, Chase's conduct would subject it to moral blame. Finally, as the *Garcia* court explained, recent statutory enactments demonstrate "[t]he existence of a public policy in favor of preventing future harm to home loan borrowers." *Garcia*, 2010 WL 1881098, at *3 (citing Cal. Civ. Code § 2923.6). In *Rijhwani*, this court held that a lender has a "surely has a duty to submit a borrower's loan modification application once the lender has told the borrower that it will submit it." *Rijhwani* at *17. Here, where Chase offered the Rowlands a loan modification, admitted its repeated errors,

---

[6] Many of the facts alleged in the Rowlands' complaint are more compelling than those in *Garcia*. The only distinction that could be construed as mitigating – that the Rowlands did not lose their home – does not affect the analysis in any way. *See Trant v. Wells Fargo Bank, N.A.*, No. 12-CV-164-JM-WMC, 2012 WL 2871642 (S.D. Cal. July 12, 2012) (rejecting the same distinction because "the fact that the *Garcia* plaintiff's home had already been sold may mean that plaintiff was in a worse position, but that concerns the level of damages.").

and transferred the servicing rights shortly thereafter, public policy supports the existence of a duty. *See* Complaint ¶ 40. As in *Rijhwani*, and at the pleadings stage, Chase's role is not merely "a 'conventional' one that relates to the 'mere' lending of money." Plaintiffs state a claim.

**C.  Plaintiffs' Negligence Claim – Economic Loss Rule**

Chase argues that the Rowlands' negligence claim is barred by the economic loss rule. "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1064 (N.D. Cal. 2012) ("Purely economic damages to a plaintiff which stem from disappointed expectations from a commercial transaction must be addressed through contract law; negligence is not a viable cause of action for such claims."). "Economic loss consists of damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits – without any claim of personal injury or damages to other property." *Id.* (internal citations omitted). The purpose of the rule is to prevent "the law of contract and the law of tort from dissolving one into the other." *Id.*

Chase argues that the economic loss rule bars the Rowlands' negligence claims because "[e]ach and every action that the plaintiffs allege to be a breach of a 'duty' by the servicer, are simply breaches of the contractual arrangement between the parties." Motion at 7. Chase relies primarily on *Erlich v. Menezes*, 21 Cal. 4th 543 (1999). There, the homeowners sued the contractor who built their home, alleging breach of contract, fraud, negligent misrepresentation, and negligent construction. *Id.* at 553. The court held that the plaintiffs could not recover for their mental distress damages arising out of a negligent breach of contract because the plaintiffs could not establish a duty of care independent from the breach of contract. *Id.*

The economic loss rule applies to claims for "loss due to disappointed expectations." Only one case cited by the parties squarely addresses the economic loss rule in the mortgage context. *See Monday v. Saxon Mort. Servs.*, No. CIV. 2:10-989 WBS KJM, 2010 U.S. Dist. Lexis 125470, at*13 n.2 (E.D. Cal. Nov. 29, 2010). There, the court stated the following:

> The claim is not barred by the economic loss doctrine, which would otherwise preclude recovery for purely economic loss. That doctrine is intended to bar recovery that could be

1
2
3 obtained through a breach of contract action. *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1180 (C.D. Cal. 2009). The doctrine cannot be properly applied to this case; it normally applies in products liability and construction defect cases where physical injury is even possible and a contract has been breached. *Id.* at *13 n.2.[7]

4 The economic loss rule does not apply, however, in cases where a "special relationship exists,"
5 and this is articulated alternatively as "a legal duty." *J'aire Corp. v. Gregory*, 24 Cal. 3d 799, 804
6 (1979); *see Erlich*, 21 Cal. 4th at 983 ("An omission to perform a contract obligation is never a tort,
7 unless that omission is also an omission of a legal duty.") (internal quotation omitted). "When a
8 special relation exists between the parties, a plaintiff may recover for loss of expected economic
9 advantage through the negligent performance of a contract although the parties were not in
10 contractual privity." *Id.* (citing *Biakanja v. Irving*, 49 Cal. 2d 647 (1958)). As the Court's citation
11 to *Biakanja* suggests, the test for determining the existence of a special relationship under the
12 economic loss rule is identical to the test applied above for determining the existence of a duty of
13 care. *See Monday*, 2010 U.S. Dist. Lexis 125470, at *13 n.2 ("the same *Biakanja* factors applied
14 here also provide an exception to the economic loss doctrine when a special relationship exists
15 between plaintiff and defendant") (citing *J'Aire Corp.*, 24 Cal. 3d at 804-05); *In re Sony Gaming*
16 *Networks & Customer Data Sec. Breach Litig.*, No. MDL 11MD2258 AJB MDD, 2014 WL 223677,
17 at *14 (S.D. Cal. Jan. 21, 2014) (same). Because the *Biakanja/Nymark* factors discussed above
18 demonstrate that Chase had a duty of care (at least at the pleading stage), the economic loss doctrine
19 does not apply.

20 Defendants do not directly challenge the Rowlands' detailed legal arguments on the
21 inapplicability of the economic loss rule. *See* Reply at 4. Their most substantive response is a
22 citation to *Mehta v. Wells Fargo Bank, N.A.*, a mortgage case where the court held that plaintiffs'
23 intentional infliction of emotional distress claim was insufficiently alleged and noted that, to the
24 extent it was based on loss of his home to foreclosure, "[n]o California case has allowed for recovery

25

26 [7] In *Monday*, the court denied defendants' motion to dismiss a homeowner's negligence
27 claim against the servicer that allegedly misapplied payments causing the plaintiff's account to appear as if she were in default, which led to attempted foreclosure and an unlawful detainer suit (at
28 which the homeowner prevailed). The court applied the *Nymark* factors and found that the servicer had a duty of care and that the complaint sufficiently alleged breach of that duty. *Id.* at *7-11.

for emotional distress arising solely out of property damage." 737 F. Supp. 2d 1185, 1204 (S.D. Cal. 2010) (citing *Erlich*, 87 Cal. Rptr. 2d at 886). *Mehta*, however, also recognized the exception that when "conduct amounting to a breach of contract" also violates an independent duty, the conduct "becomes tortious." *Id.* at 1200. Because that exception applies here, *Mehta* does not alter the conclusion that Plaintiffs state a claim.

**D. Intrusion Upon Seclusion**

Chase also argues that Plaintiffs do not allege facts sufficient to support a claim for intrusion upon seclusion. *See* Motion at 8-9; Complaint ¶¶ 78-86.

Under California law, the essential elements of an intrusion upon seclusion claim are as follows: "(1) [t]he defendant intentionally intruded, physically or otherwise, upon the solitude or seclusion, private affairs or concerns of the plaintiff; (2) [t]he intrusion was substantial, and of a kind that would be highly offensive to an ordinarily reasonable person; and (3) [t]he intrusion caused plaintiff to sustain injury, damage, loss or harm." Cal. BAJI 7.20; *see Joseph v. J.J. Mac Intyre Companies, L.L.C.*, 238 F. Supp. 2d 1158, 1169 (N.D. Cal. 2002)). "To show intrusion, a plaintiff must have 'an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source,' and the defendant must have 'penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff." *McFaul v. Bank of America, N.A.*, No. 5:12-cv-05685-PSG, 2014 WL 232601, at *3 (N.D. Cal. Jan. 21, 2014) (quoting *Thompson v. Chase Bank N.A.*, No. 09-cv-2143-DMS-POR, 2010 WL 1329061, at *4 (S.D. Cal. Mar. 30, 2010)).

Plaintiffs point to the following allegations (and reasonable inferences from them) that support the claim:

1. The Rowlands received repeated collection calls, including over 50 calls after they requested the calls cease. Compl. ¶¶ 2, 23, 24, 38.

2. Chase had all the facts necessary to know that the collection efforts were unjustified because it had agreed to the loan modification and the Rowlands were current on the payments required under that agreement.

3. The Rowlands repeatedly told Chase that the modification was in place, and Chase acknowledged this on several ocassions. *See id.* ¶¶ 18, 23-25, 28-31, 33-36, 38.

4. Chase personnel visited the Rowlands' home as part of their collection efforts. *Id.* ¶ 27.

5. Although the Rowlands were making timely payments under the loan modification agreement, Chase reported to a credit reporting agency that the Rowlands were delinquent in

1   their mortgage payments. *Id.* ¶ 2.

2   6. Chase's collection agents in different departments could not see the loan modification in their systems, which suggests that Chase's procedures rendered its collection agents incapable of responding to meritorious disputes. *Id.* ¶¶ 23-24, 30.

4   7. Although Chase was aware that it was not honoring the loan modification because of its own miscalculations, it gave the Rowlands a series of conflicting and incorrect explanations for the problems. *Id.* ¶¶ 39-40.

6   8. At least one Chase collection agent exhibited bullying behavior toward Ms. Rowland. *See id.* ¶ 30.

*See* Opp'n at 26-28. In *McFaul*, another court in this district recently denied in relevant part Bank of America's motion for summary judgment on the plaintiff's intrusion upon seclusion claim. There, the plaintiff (also represented by one of Plaintiffs' counsel) provided evidence that the bank engaged in behavior very similar to the Rowlands' allegations against Chase. *Compare McFaul*, 2014 WL232601, at *4, *with* Opp'n at 26-28 and the cited allegations in the Complaint.

Defendants attempt to distinguish *McFaul* because there "[t]he loan had been paid off, and yet the lender continued to contact the borrower, seeking payments that were in fact *not* owed." Reply at 4. But as in *McFaul*, Chase repeatedly contacted Plaintiffs seeking payments they did not owe because they were complying with the loan modification agreement.

Defendants also argue that the Rowlands' allegations are similar to those in two complaints where the court granted motions to dismiss claims of intrusion upon seclusion. *See* Motion at 8-9; Reply at 5. In the first case, *Castellanos v. JPMorgan Chase & Co.*, No. 09-CV-00969-H (JMA), 2009 WL 1833981, at *10 (S.D. Cal. June 23, 2009), the court explained that "[a]llegations of a lender calling a debtor concerning a home equity loan extended to the debtor, especially given the current economic climate, without more is not enough to state a claim for invasion of privacy above a speculative level." The factual allegations were that the plaintiff retained a law firm to represent him with regard to a consumer debt he incurred with the defendants and the defendants continued to contact him (and his brother-in-law) after the law firm sent defendants a cease and desist letter. *Id.* at *1  Those allegations were insufficient to state a claim because the plaintiff "fail[ed] to allege the content of any of the calls . . . and what was highly offensive about such calls." *Id.*  As demonstrated in the summary above, the Rowlands provide far more factual detail than in

*Castellanos*.

Defendants' second case is *Marseglia v. JP Morgan Chase Bank*, 750 F. Supp. 2d 1171, 1173-4 (S.D. Cal. 2010), in which the plaintiffs invasion of privacy claim was based on allegations that the defendants continued to contact them after being informed the plaintiffs had retained counsel (the same firm as in *Castellanos*). Relying on *Castellanos*, the court dismissed the claim without prejudice because of the following deficiencies:

> [T]here are no allegations that defendant ever spoke with either plaintiff but, instead, the FAC alleges only that defendant telephoned plaintiffs on a daily basis, including early morning and late at night[,] calling frequently to annoy and harass plaintiffs at their home. Although plaintiffs allege a total of fifty (50) calls were made in one week, there are no facts alleged upon which this Court could infer plaintiffs ever answered any of these calls or defendants ever made any direct contact with plaintiffs that might be construed as annoying or harassing conduct. Without such allegations, this Court is not convinced that the number of calls in itself can be considered highly offensive above a speculative level.

*Id.* at 1177-78 (citations and quotations omitted). In contrast, the Rowlands provide more robust factual detail to support their claim, alleging that Chase representatives contacted them many times over a period of years, were harassing on at least one occasion, and repeatedly threatened the Rowlands with foreclosure. Accordingly, the court denies Defendants' motion to dismiss.

## CONCLUSION

The court **DENIES** Defendants' motion to dismiss. Chase and U.S. Bank must answer the complaint within 14 days from the date of this order. *See* Fed. R. Civ. P. 12(a)(4)(A).

This disposes of ECF No. 5.

**IT IS SO ORDERED.**

Dated: March 12, 2014

LAUREL BEELER
United States Magistrate Judge